THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSEPH BIGSBY, Defendant-Appellant.

First District (3rd Division)    No. 63153

Opinion filed August 24, 1977.

James Doherty, Public Defender, of Chicago (Timothy P. O'Neill and John Thomas Moran, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Defendant, Joseph Bigsby, was found guilty in a jury trial of two counts of armed robbery, three counts of attempted murder and one count of murder. He was sentenced to 5 to 20 years for each count of armed robbery, 20 to 50 years for each count of attempted murder and 100 to 200 years for murder. Defendant appeals alleging that he was denied a fair trial by the prejudicial remarks of the prosecutor; that the evidence does not support separate convictions for two counts of attempted murder; and that his sentence is excessive.

At approximately 2 p.m. on September 28, 1973, in the vicinity of 80th and Kingston in Chicago, Marvin Watts was robbed by a person, described as a 5′4″, 145 lb., 16 year old, brown-skinned male wearing a green army jacket, blue shirt, and blue pants, who pointed a German Luger at him and took his money and his watch. He identified the defendant as the man who robbed him. Lewis Lytele was robbed in the same vicinity a few minutes later at gunpoint by a person who fitted that same description. He also identified the defendant. Sidney Walker observed a person in an army jacket at 80th and Kingston with a German Luger in his hand talking to a man with a dog. He went into his home and told a woman there to call the police. He went up to the second floor and through the window saw the man rob Lewis Lytele. As Lytele was walking away the police arrived. Walker told Lytele to come into his home and they watched the person run north on Kingston and down a gangway. The police gave chase. Walker heard a shot after the young man went into a backyard. He identified defendant in a lineup later that day.

Sergeant John Mitchell of the Chicago Police Department was the first officer on the scene in response to a radio message. He observed a male fitting the broadcast description walking north on Kingston on the east side of the street. He pulled his squad car, which was facing south, to the curb about 20 feet from the suspect, facing the suspect, who then ran east

through a driveway. He pursued the man after making a broadcast on his lapel radio. As he arrived at the driveway he saw a person fitting the broadcast description having a conversation with a resident. He noticed that the person was wearing a green army jacket, a dark shirt, and had a German Luger pistol stuck in his waistband. He pointed his gun at the suspect and said, "Stop, you are under arrest." The suspect, whom he later identified as the defendant, started to run northwest toward a small gangway. He told him to stop or he would shoot. Defendant continued to run until he came to the end of the gangway. He then turned and his right hand "flipped toward the center of his body." Mitchell fired one shot at defendant toward his legs to try to stop him. Defendant fled. Mitchell called on his radio indicating he had lost sight of defendant. He continued to look for defendant as other squad cars, police officers, and onlookers arrived in the vicinity. About two minutes later he heard other shots fired and a short time later another series of shots. He heard on his portable radio that a police officer had been shot and a suspect was in custody. Mitchell remained on the scene and later saw to it that witnesses Lytele and Walker were taken to the police station to view the lineup wherein Walker, Lytele and Mitchell independently identified the defendant.

Anthony Norka, a Chicago Police Officer, testified that he arrived on the scene simultaneously with plainclothes Officers Daniel Abate and Edward Barron. He had received an erroneous radio message that Mitchell had been fired upon, when in fact up to this point only Mitchell had fired a shot. All three officers with guns drawn headed toward a white picket fence at 7958 South Colfax where Norka observed a young man with a gun facing east backing away in a semi-crouched position. Officers Abate and Barron identified themselves as police officers and ordered defendant to drop his gun. Defendant fired one shot at them. Officer Barron fell. Abate fired at defendant who dropped the gun and reached down toward his left leg below the knee. The defendant then picked up the gun and fired a second shot. Abate fired and Norka fired. The defendant then headed toward the rear of the building. Norka used his radio to inform the dispatcher that a policeman had been shot and an ambulance was needed. He directed the officers to the rear of the building where he had last seen defendant and then he heard several shots. Defendant then came limping back into his view with his hands raised. Officers Abate and Keith Grabowski subdued the defendant. He was searched but no weapon was found on him. A gun was found on the roof of a building near 7958 South Colfax.

Officer Abate's testimony corroborated that of Norka. Abate had remained with his wounded partner, Barron, until the defendant ran out from behind the building with "a staggered gait." He grabbed the defendant, threw him to the ground and handcuffed him. Grabowski

searched the defendant and took him into custody. He identified the defendant in a lineup later that day.

Officer Grabowski testified that he heard several shots fired as he arrived in the vicinity of 7958 Colfax. He saw a man fitting the broadcast description in the rear yard of that address. When called "Halt, Police" the defendant who was limping raised his hand and fired a shot at Grabowski and his partner, Officer Richard Gaffney. Grabowski fired two shots in return. The defendant then backed around the corner and disappeared from Grabowski's view. Heading east, Grabowski and Gaffney pursued the defendant and caught sight of him again as Abate was approaching defendant from the opposite direction. Grabowski searched the defendant after Abate had handcuffed him and found a watch with a blue band and some money in defendant's pocket. Officer Gaffney's testimony corroborated Grabowski's.

Officer James Nemec, a crime laboratory technician, testified that he examined a German Luger which was found on the rear porch roof of 7958 Colfax. No fingerprints were found on the outside of the gun. The magazine clip was empty, that is, there were no cartridges in the magazine, but an apparently suitable latent fingerprint was found on the magazine. He put the gun, magazine, and several spent .9 millimeter casings and metal fragments that had been recovered from the yard below into his evidence case. Pursuant to a search warrant, a box of .9 millimeter cartridges was found in defendant's bedroom drawer.

Testimony was later given by Frank M. Nicholson, a police fingerprint technician, that in his opinion the fingerprint on the magazine matched that of the defendant's third finger of his right hand.

The defendant testified that he is left-handed, was 16 years old at the time of the incident and 18 at time of trial. He said that about 1 p.m. on September 28, 1973, he bought four "reds" or "downers" from someone at 79th and Manistee, took three of the pills and walked down 79th Street to the alley between Kingston and Colfax where he encountered a man in a red shirt who asked him for money. Someone called out to the man and he left. The defendant then felt drowsy and fell against a garage. He heard shooting and when it stopped he saw the man in the red shirt run past him. Defendant arose and ran through a yard toward Colfax. He fell and when he got up his leg was bloody. He began to walk toward two policemen who tackled him, then handcuffed him and put him into a police car. He denied being on Kingston Street that afternoon or having committed any of the crimes with which he was charged. The fingerprint was put on the ammunition clip when the policeman at the station put it close to his face and he pushed it away.

The defendant first argues that he was denied a fair trial by several prejudicial remarks the prosecutor made during the course of the State's

rebuttal argument. During the course of that argument the prosecutor said the defense counsel "hasn't put anything to you [the jury] straight-forwardly"; that "[t]here was a defense created for" the jury; that there was a "diversion, smoke-screen, side issue, sympathy for the defendant and prejudice against the Police Department"; that defense counsel "ignored the facts because the facts were against the defendant"; that defense counsel "created" side issues to "[g]et away from the truth"; and "Once again, that demonstrates the deceit that has been shown to you through Mr. Bigsby's defense." Objections were made and overruled to all except the last statement. The court sustained the objection to that statement and ordered that the comment be stricken.

The State responds that defense counsel was the first to mention a smoke screen and that the State's comment to the effect that defense counsel's argument was not straightforward, and its argument concerning side issues were appropriate because two eyewitnesses to the murder testified as to the identity of the defendant and the incriminating evidence was overwhelming. Therefore, they were appropriate comments on the evidence. The comments concerning a diversion, a smoke screen, side issue and sympathy for the defendant were provoked by comments of the defense attorney, evidence elicited by the defense that witnesses saw unidentified police officers beating an unidentified person, and the defendant's testimony that he was framed because his fingerprint was placed on the ammunition clip. In defendant's closing argument, defense counsel accused the prosecution of tampering with the evidence to acquire the defendant's fingerprint on the ammunition clip and lying about how it got there.

The defendant cites *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, where the supreme court reversed and remanded a conviction for armed robbery where the closing argument by the prosecutor "charged the defendant with lying and attempting to create a reasonable doubt by 'confusion, indecision, and misrepresentation'." In *Weathers*, the prosecutor repeatedly charged that the defendant lied. He told the jury that the defendant was a habitual criminal who avoided arrest only because he was a "pretty sharp cookie" who was "too smart." The defendant had no arrest record and there was no evidence to support the prosecutor's charge. The supreme court found these and other prosecutorial comments "severely prejudicial." The court noted that "Each case of this kind must be decided on its own facts." Since the court could not say that they did not contribute to the defendant's conviction the court reversed and remanded the matter.

The defendant also cites the case of *People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317, where the prosecutor in his closing argument charged that the defendant was lying, termed defense counsel a "clever

lawyer" who knows about the defense of drunkenness, and in a most direct fashion implied that the evidence of drunkenness was fabricated after the conversation with the lawyer. The court found that the evidence was close and highly conflicting and since the court could not say that the defendant was not prejudiced a new trial was granted. In *People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19, the prosecutor continually, and after being repeatedly admonished, accused the defense attorneys of making up a defense case and suborning perjury. Additionally, the prosecutor commented on the fact that the defendants did not take the stand to testify. Because of the prosecution's disregard of the court's ruling and his continued misconduct, the court remanded the case for a new trial. In another case cited by the defendant, *People v. Hovanek* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, the trial was replete with error due to the highly inappropriate conduct of the prosecutor. That conduct is not pertinent to the instant appeal. The court in *Hovanek* briefly commented that the prosecutor accused the defense counsel of deliberately trying to mislead the jury and that the defendant had been a well-coached witness who engaged in theatrics on the stand. The court cited *Stock* and said that such conduct has been criticized and reversed and remanded the case.

■■■ The factual situation surrounding each of the cited cases and the instant case vary considerably. As we noted earlier in citing *Weathers* each of these cases must be decided on their own facts. The statement concerning deceit is inappropriate and is to be condemned. Any suggestions that defense counsel deliberately created a defense are also inappropriate. Many of the other remarks were fair comment and appropriate responses to the charges that the prosecution tampered with the evidence. We do not believe that the improper statements contributed to the defendant's conviction. Nor do we feel that the conduct was deliberate.

Defendant next argues that the prosecutor's reference to the deceased's family was prejudicial error. The State's first witness on May 5, 1975, was Nancy Barron, widow of the deceased who testified that Barron was alive and in good health on September 27, 1973, and that when she saw him on September 28, 1973, he was dead. During her testimony the court noticed that the deceased's mother who was in the courtroom was sobbing and sua sponte ordered a short recess. The court, outside the hearing of the jury, stated that the jury could have heard her sobbing but since a recess was declared immediately the "situation is not of such great distraction that a mistrial should be declared," and accordingly denied the defendant's motion.

Closing argument in the case began 10 days later on May 15. During that lengthy argument the prosecutor stated, "I'm not asking for vengeance for a policeman's life and for his family. I'm asking you for the same justice that Joseph Bigsby is entitled to * * *."

■■ Although the jury argument which dwells upon the deceased's family is inflammatory and improper (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436), mere reference to the family does not in every instance require reversal. (*People v. Jordan* (1967), 38 Ill. 2d 83, 230 N.E.2d 161.) Such is the case here. The fact that the deceased's mother was noted sobbing with emotion in court 10 days before the single fleeting mention of "family" by the prosecutor in closing argument does not warrant reversal. *People v. Stein* (1977), 51 Ill. App. 3d 421, 366 N.E.2d 629.

■■ The defendant argues that the evidence does not support separate convictions and sentences for the attempted murder of Richard Gaffney and Keith Grabowski. Both Gaffney and Grabowski testified that while they were pursuing the defendant he fired one shot at them. Defendant cites *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1, for the proposition that there can be only one conviction for a single act of a defendant. In that case convictions for rape and the lesser included offense of indecent liberties were held to be improper. There is no question here of a lesser included offense. Defendant fired at both officers, endangered both their lives and displayed an intent to kill either or both of them. As in a recent and factually similar case, *People v. Mimms* (1976), 40 Ill. App. 3d 942, 353 N.E.2d 186, both counts of attempted murder arose from a single shot fired at two police officers, the State proved both counts and the penalties for each offense were identical. We, therefore, will not disturb the convictions or the sentences.

■■■ Finally, defendant argues that the sentence of 100 to 200 years for the murder of Officer Barron is excessive. The defendant claims that the trial court failed to consider rehabilitative potential when imposing sentence, and that the sentence of 100 to 200 years is not indeterminate. A review of the record indicates that the court did consider, *inter alia*, the possibility of rehabilitation in light of the seriousness of the offense, the tender age of the defendant and the eligibility for parole after less than 20 years. The court concluded that in light of the severity of the crime and the defendant's lack of remorse that there was little, if any, probability of rehabilitation. Restoration of the offender is not to be given greater consideration than the seriousness of the offense. (*People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 301 N.E.2d 300.) The court may properly consider the defendant's failure to show a penitent spirit, the seriousness of the offense (*People v. Morgan* (1975), 29 Ill. App. 3d 1043, 332 N.E.2d 191), and the need of society to be protected (*People v. Reynolds* (1974), 23 Ill. App. 3d 317, 319 N.E.2d 114). In light of the above we do not believe the court abused its discretion in imposing sentence.

■■ The defendant contends that a sentence of 100 to 200 years is not an indeterminate sentence. In *People v. Luckey* (1975), 35 Ill. App. 3d 179, 341 N.E.2d 112, the defendant contended his sentence of 75 to 150

years was not indeterminate as required by statute. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(a).) The court in *Luckey* rejected that contention noting that the sentences imposed were "authorized by statute (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1) and comparable to sentences upheld for other murders." We find *Luckey* dispositive of this issue.

For the reasons stated above the judgment of the trial court of Cook County is affirmed.

Affirmed.

SIMON, P. J., and McNAMARA, J., concur.