THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICIA BASS, Defendant-Appellant.

First District (6th Division)   No. 1—89—3196

Opinion filed September 27, 1991.

232

EGAN, J., specially concurring.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Mary Brigid Kenney, and Michael Brychel, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant-appellant Patricia Bass appeals her convictions for armed robbery and murder, for which, after a jury trial, she was sentenced to a term of imprisonment of 30 years. Defendant raises several issues on appeal, namely: that the trial court erred in denying defendant's motion to quash arrest due to a lack of probable cause because the police knew that their search warrant applied to two different apartments at the premises and/or the police had an insufficient basis to arrest defendant; that the State provided insufficient race-neutral reasons for exercising peremptory challenges under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; that defendant was denied a fair trial by (a) argument and testimony relating to police reports and an interview with an individual implicating defendant in the crimes for which defendant was tried, (b) courtroom tactics by the State unnecessarily suggesting a gang connection to the prosecution, and (c) the allowance of "mugshots" of codefendants to go to the jury room during jury deliberation; that defendant was denied a fair trial by the State's introduction of testimony about the victim's ethnic background and about the victim's "American dream"; and that defendant's sentence for murder was excessive.

Defendant was, along with Earl Harris, Jr., and Kevin Walton, charged with the armed robbery of Maciej Grzyna and the murder of Wojtek Rutkowski. Defendant was tried separately from both these codefendants and another codefendant, Michael Boyd.

Prior to defendant's trial, a hearing was held on defendant's motion to quash the arrest. The witnesses at the hearing were defendant, her sister Annette and Officer Vukonich. While defendant denied being in the unit of the building where Vukonich said she was arrested, the trial court disbelieved defendant's testimony, as defendant

was admittedly drunk at the time. Vukonich testified about the obtaining and execution of the search warrant as follows.

Vukonich was assigned to the Gang Crimes North Unit of the Chicago police department. He testified that in October of 1986 his partner obtained a warrant to search the "first floor apartment at 2712 West Evergreen," in Chicago, Illinois. The search warrant was for a sawed off shotgun and an individual named Mike. The following colloquy took place during Vukonich's testimony.

"DEFENSE COUNSEL: Q. Officer, I would like to take a look at People's Exhibit Number 1 *** the search warrant *** On the front page, it says first floor apartment, at 2712 West Evergreen, is that correct?

A. That is correct.

Q. It doesn't say first floor rear apartment, does it[?]

A. No, it does not.

Q. When you went there, you noticed that there was also a first floor front apartment, didn't you?

A. Yes, sir.

Q. So there is [sic] two apartments on the first floor of that address, isn't [sic] there?

A. Yes.

Q. There is a rear apartment ***. There is a front apartment ***.

A. Yes, sir."

It was the rear apartment that Vukonich searched. Vukonich testified that when he and other police officers went to the rear apartment, they announced that they were police officers and immediately heard a female voice from within the apartment shout "Police, run." At this point, an officer smashed a hole in the panel of the door, and Vukonich looked in and saw defendant Bass and another individual in the kitchen. The officers then smashed the door open, and after some commotion, arrested defendant, who had attempted to flee, and the man they had seen in the kitchen with defendant. In connection with the execution of the warrant, a total of 10 people were arrested, some of whom had fled to a second-floor apartment. Defendant was arrested for and charged with obstruction of service and was taken to the police station.

Defendant had testified at the hearing that she arrived at the building, which was owned by a friend, at about 7 a.m. The execution of the warrant took place at approximately 10 a.m. The trial judge denied defendant's motion to quash the arrest.

Following pretrial motions, the jury was selected and sworn. During jury selection, defense counsel objected to the State's use of peremptory challenges to exclude black women jurors. (Defendant is black as well.) Prior to the commencement of the trial, but after the jury had been chosen, defense counsel stated that during *voir dire* he noticed that the State's Attorney's cart was facing the jury and that on the front of the cart the codefendants' names appeared, as well as the words "Black Gangster Disciples" in red letters. Defense counsel asserted that the jury was able to see this. The trial judge ordered the State to turn the cart around, to which the assistant State's Attorney responded that the cart was already turned around.

At trial, Maciej Grzyna testified (through the aid of an interpreter, as Grzyna spoke Polish) that on the evening of the occurrence, he was working, alone. The owner of the bar, Wojtek Rutkowski and his wife, Halina, were sleeping in their apartment in the back of the bar. There were two customers in the bar at about 2 a.m. At this time, Grzyna heard some glasses breaking as he was approaching the cash register. He turned around and saw a man standing on the bar. The man grabbed his head and held a gun to it. A woman joined the man, and they began pushing Grzyna. After he had been pushed from the cash register, the woman removed the cash from the register. The gunman backed away from the bar at this time. Grzyna saw the silhouettes of two other people around the front door of the tavern.

As the gunman was backing away from the bar, Grzyna testified, Wojtek Rutkowski came out of the rear apartment area dressed in his underwear. Rutkowski yelled "Police, Police," and the gunman then shot Rutkowski twice. The woman was still taking the money from the register as the shots occurred. Rutkowski died as a result of the gun wounds.

Following the testimony of Grzyna, a further discussion between counsel and the trial judge took place regarding the cart with the words "Black Gangster Disciples," at which time defense counsel again stated that the cart had not been turned around until after the jury had been selected. Defense counsel at this time brought another matter to the court's attention—the fact that a blue notebook was on the State's Attorney's table which had white letters saying "Gangs Prosecution" on it. The court indicated that he could not see it from the court's vantage point and doubted that anyone had seen it, although defense counsel asserted that it could be seen clearly from the jury box. The prosecutors agreed that the case was not a gang

case, but stated that the book had been "open" during the proceedings. The trial judge ordered the prosecutors to remove the book.

Next, Halina Rutkowski, the victim's wife, testified. Previous to trial, defendant argued a motion *in limine* to limit or exclude testimony relating to how the Rutkowskis came to the United States, how they met, their courtship and the like. The motion was denied with the admonition from the trial judge to the State to keep such testimony brief. Halina Rutkowski did in fact testify relating to her background coming to the United States from Poland, meeting her husband and to the fact that her husband dreamed of owning a bar, worked to purchase and did purchase the bar where the robbery and murder took place. The State further introduced testimony from several police officers and detectives who were summoned to the tavern shortly after the incident.

The State, in its case in chief, introduced certain testimony relating to the investigation of the incident. Officer Vukonich again testified. He related that he was assigned to the gang crimes division of the Chicago police department, and he related defendant's arrest. Next, Detective Bogucki testified. He testified that he and his partner were assigned to conduct a follow-up investigation relating to the instant case. He stated that he started out the investigation by reviewing a series of police reports involving armed robberies which were occurring in the northwest and west side of the city. Bogucki stated that in reviewing these reports, he was able to come up with the name Patricia Bass relating to his investigation. Bogucki further testified that he spoke with one Willie Anderson and that after this conversation, the search for defendant, as well as codefendants, "intensified."

On October 20, 1986, Bogucki was informed that defendant was in custody. At about 5 p.m. he interviewed defendant. After giving defendant her *Miranda* warnings, defendant made the following oral statement. On the date of the incident, defendant was with three other men—"Michelob," "Country" or "CC," and Earl. They went to the victim's tavern. Earl entered the bar first and held a gun to the bartender's head while defendant emptied the cash register. The victim came into the bar from the back door and said something about the police, at which point Earl shot the man twice. The robbers then fled the scene and divided the proceeds.

Bogucki then testified, over objection, that he conducted an interview with Earl Harris. The court limited the testimony to show police investigation of the incident, and the jury was instructed to this effect. Bogucki related that after speaking with Harris, officers from

gang crimes were contacted and asked if they could locate a suspect by the name of Kevin Walton, also known as "Country." When the State attempted to elicit from Bogucki the reason why he contacted gang crimes in an attempt to find Walton, and what Bogucki instructed gang crimes to do in regard to Walton, defense counsel's objections were sustained.

Bogucki further testified that he and Assistant State's Attorney Shelly Sutker had a conversation with defendant at about 9:45 p.m., and that a court reporter transcribed defendant's confession at about midnight. Further, at about 3 a.m., a patron from the bar who was present the night of the incident was brought to the police station. Defendant identified the patron as being present during the incident.

Sutker also testified as to the taking of the confession. The transcribed confession essentially mirrored the oral confession. Also, Sutker testified that defendant identified photographs of the codefendants.

Defendant testified on her own behalf. She denied participating in the robbery of the tavern and denied being with the men who perpetrated the robbery that evening. Defendant further testified that she had heard about the robbery and shooting while she was in custody with the codefendants (who had also been arrested when defendant was arrested). She admitted that the codefendants were friends of hers. Defendant related that the reason she gave the confession was that a police officer, who was Caucasian, in his mid-thirties and about 6 feet tall, had threatened to take her children away if she did not confess. Defendant admitted on cross-examination that the codefendants did not provide the details to the incident that she provided in her confession.

Despite the trial court's initial questioning of the value of the mugshots of the codefendants being allowed into the jury room, the trial court allowed this evidence to go to the jury on the basis of the mugshots being "part and parcel" of the confession.

The first issue we address is whether the trial court erred in denying defendant's motion to quash defendant's arrest due to: (a) the police, before executing the warrant, discovering that the warrant applied to two units of the first floor; or (b) there being an insufficient basis for the police to connect defendant as being the individual who stated "Police, run," when the police began executing the warrant.

■ Defendant's second contention that it was error not to grant the motion to quash arrest—because the police did not have a sufficient basis to believe that defendant was the person who shouted

"Police, run," as the police were executing the warrant—is unconvincing. Defendant stresses that the police did not see defendant say this, and there were several other females at the building who could have said it. Vukonich, however, testified that he heard the warning, and that when the door was immediately smashed, he saw defendant standing there in the kitchen. This is a fact question that was the subject of the initial hearing as well as a motion to reconsider. The trial judge's determination should not be reversed, as a finding of probable cause will be reversed only when it constitutes manifest error. (*People v. Pugh* (1989), 187 Ill. App. 3d 860, 867, 543 N.E.2d 875.) Here, we cannot say that the facts and circumstances known to the arresting officers would not lead to their reasonably prudent belief that defendant was obstructing service of the warrant. See *People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475.

Defendant's other contention of error in the denial of the motion to quash arrest requires more lengthy discussion. This contention is that the search was constitutionally infirm due to the fact that the warrant did not specify which apartment on the first floor was to be searched. Initially, we address the State's argument that defendant has waived this issue. The record reveals that defendant never argued to the trial court that the search was invalid for this reason. The motion to quash defendant's arrest does not raise this contention. Even after the testimony came out at the hearing, defendant never argued the constitutional invalidity of the search in argument or on the motion for reconsideration of the denial of the motion. To be sure, defense counsel in argument did refer to the fact that the warrant did not specify which first-floor apartment was to be searched. Defendant never, however, presented the argument she now makes.

Moreover, defendant's motion for a new trial simply read as follows:

> "The Trial court erred in denying defendant's pre-trial motion to suppress her arrest, specifically but not exclusively, the evidence showed that [the] police had no basis to arrest defendant and take her to the police station when there were other females inside the residence and they could not identify defendant's voice as the voice that stated police were at the front door. Further, the comment attributed to defendant was not sufficient to establish obstruction of process. Also, the time defendant was held at the police station on said charge without being taken before a judge was so long as to require suppression of her subsequent confession."

As can be seen, defendant never raised the challenge to the denial of the motion to quash in the post-trial motion that she now raises.

It is well settled that in order to preserve an issue for appeal, both an objection at trial and a written post-trial motion raising the issue are required. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Here, there was no objection on the ground defendant now raises. To be effective, moreover, "a post-trial motion must set forth with adequate specificity the errors relied upon." (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 396, 459 N.E.2d 1102.) The post-trial motion in this case is insufficient to preserve the issue for appeal as well, as while it raised a number of grounds in favor of suppressing defendant's confession, it did not specifically raise the ground defendant now argues.

Defendant, however, argues that we should address the issue as plain error. Under Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)), however, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Courts may consider plain error "where the record clearly shows *** an alleged error affecting substantial rights." (*People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 461.) This rule serves the dual purposes of "correcting serious injustices" and preserving "the integrity and reputation of the judicial process." (*Young*, 128 Ill. 2d at 46.) Therefore, the rule applies only "when the question of guilt is close and the evidence in question might have significantly affected the outcome of the case [citations], or where the error alleged is so substantial as to reflect on the fairness or impartiality of the trial regardless of how closely balanced the evidence is [citations]." *People v. Sanders* (1983), 99 Ill. 2d 262, 273, 457 N.E.2d 1241.

To apply the plain-error exception to the waiver rule, courts should first determine if the record plainly shows that an error affecting substantial rights was committed. (*People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227.) This criterion is met in criminal cases when "the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial or sentencing hearing. [Citations.]" *Young*, 128 Ill. 2d at 47.

Thus, a reviewing court must first examine the record to find the strengths and weaknesses of evidence against the defendant, because "if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved." (*People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233.) For example, if a defendant is clearly identified as the robber by three witnesses and treated for gunshot

wounds received during the robbery, the evidence is not close enough for an appellate court to review an alleged error already waived by the defendant. *People v. Howell* (1975), 60 Ill. 2d 117, 121, 324 N.E.2d 403.

Second, the court must look for "those errors of such magnitude that the commission thereof" precludes a fair trial. (*Carlson*, 79 Ill. 2d at 576-77.) Such errors occur, for example, when the jury instructions fail to distinguish between intent to kill and other intents which a defendant might have had (*People v. Roberts* (1979), 75 Ill. 2d 1, 14-15, 387 N.E.2d 331), when instructions fail to distinguish between elements for an insanity acquittal and a mental-illness conviction (*People v. Fields* (1988), 170 Ill. App. 3d 1, 9-10, 523 N.E.2d 1196), or when credibility is an issue and the defendant's credibility is contrasted with the credibility and reputation of the State's Attorney's office (*People v. Sexton* (1987), 162 Ill. App. 3d 607, 615, 515 N.E.2d 1359).

We choose to consider the issue of the invalidity of the search warrant and, hence, the admissibility of defendant's confession under the plain error rule for the following reasons. The State's case in chief, while including occurrence witnesses, did not include any identification of defendant as having committed the crimes defendant was charged with. Thus, it is clear that absent the introduction of the confession, the case would not merely have been close, but defendant would have been entitled to a directed verdict.

In *Maryland v. Garrison* (1987), 480 U.S. 79, 94 L. Ed. 2d 72, 107 S. Ct. 1013, police officers obtained and executed a search warrant to search an individual and a third-floor apartment at the premises. When executing the warrant, the police officers believed that there was only one apartment on the third floor, but in fact there were two apartments on the third floor. Before the officers found out that they were not in the named individual's apartment, they observed the contraband which led to defendant's conviction. The Court observed:

> "If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to [the named individual's] apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.

The officers' conduct and the limits of the search were based on the information available as the search proceeded." *Garrison*, 480 U.S. at 86-87, 94 L. Ed. 2d at 82, 107 S. Ct. at 1017-18.

It is clear from the *Garrison* case that police personnel, who are aware (as in this case) that two apartment units exist which fit the same description, must refrain from executing the warrant if the knowledge of the defect is apparent prior to execution or must cease executing the warrant when becoming armed with knowledge of the warrant's defect during execution. The State argues that the record does not reflect when the police discovered the existence of the second unit—before, after, or during execution of the warrant. We think, however, that the testimony that the police noticed the two first-floor apartments when they went to the building is sufficient, in the absence of any contrary indication, to establish that the police discovered the existence of both units, and thus the infirmity of the search warrant, prior to execution of the warrant.

The State next argues that defendant has no standing to question the validity of the search. The State argues that defendant did not live at the apartment where she was arrested, nor was defendant an overnight guest. Thus, defendant did not have an expectation of privacy in the apartment that society is prepared to recognize as reasonable.

Defendant relies on the case of *Minnesota v. Olson* (1990), 495 U.S. 91, 109 L. Ed. 2d 85, 110 S. Ct. 1684, in arguing that she has standing to contest the validity of the search. There, the Supreme Court addressed the question of the standing of an overnight guest in another's home to challenge the legality of his arrest in the other's home. The Court chose not to examine the factors suggested by the State to determine whether a dwelling is a home, and held that a reasonable expectation of privacy indeed existed. The Court stated that it needed to go no further than concluding that defendant's "status as an overnight guest is alone enough" to show the reasonable expectation of privacy.

A review of the record, however, reveals an insufficient basis from which to conclude that defendant's status fits within the parameters of *Olson*. At the motion to quash and suppress, defendant emphatically denied being in the first-floor apartment at the time of arrest. Rather, defendant testified that she was arrested (when awoken from sleep) in the separate and distinct second-floor unit, which was owned (leased) by her friend's father. Defendant's sister corroborated defendant's testimony, testifying that she observed defendant being

escorted from the second-floor unit to the first-floor unit by a police officer. The trial court rejected defendant's factual contention that she was arrested in the second-floor apartment, choosing to believe the police officer's testimony that defendant was arrested in the kitchen of the first-floor. This factual resolution is apparent from the trial court's comments in ruling on the motion to suppress. The trial court stated: "The credibility of [defendant's sister and defendant] is very poor"; "The officers had a search warrant. Their testimony was clear and convincing to me. I don't believe the testimony of the defense witnesses"; "The defendant at the time of the arrest attempted to obstruct the service of the search warrant; told everybody to run. The officers observed her through the door. When she was told to halt she didn't stop. She continued to run." It is implicit, moreover, from the trial court's holding that there was probable cause to arrest defendant on the obstruction of process charge, that the trial court did not accept defendant's version of the events at the time of the arrest; otherwise, there would not be probable cause to arrest defendant on the charge.

More important to the resolution of the standing issue, however, is the fact that defendant clearly and unambiguously testified that she did not go to the first-floor unit to sleep that night. She went straight to the separate and distinct second-floor unit, which is where she slept and, according to defendant, where she was arrested.

Thus, we are left with a situation where defendant claims standing with respect to an apartment where she was arrested rather than the apartment where she was sleeping as a guest. Defendant, in addressing the standing issue, correctly observes that we must assume, in light of the trial court's findings, that defendant was a guest at the first-floor apartment at the time of arrest. Given the defendant's testimony, however, it is clear that the guest status at the time of arrest is the only fact upon which defendant has to argue standing. We hold that this, alone, is not enough. There is no evidence of record to establish the nature of defendant's stay in the first-floor apartment. There is no evidence to suggest that defendant had been there for more than a brief amount of time (any longer, in fact, than the seconds it took to begin execution of the warrant) or to suggest that defendant planned to stay for more than a very brief period of time. While defendant testified that it was her friend Katy Woods' apartment, given defendant's testimony there is no evidence to establish that defendant was even a "guest" at the time, in the sense of having been invited to the apartment by Woods (although this is arguably inferable).

In sum, we are convinced that mere presence in the home of a friend at the time of arrest, alone, is insufficient to confer standing. In *Olson*, the police made a warrantless, nonconsensual entry into the house where defendant was an overnight guest. Though not explicitly referred to in the *Olson* opinion, reference to the Minnesota Supreme Court opinion reveals that defendant had permission to stay indefinitely and to admit and exclude guests. The court held that defendant had standing to challenge the search of the host's house, based simply on defendant's status as an overnight guest, as this status was one establishing a reasonable expectation of privacy. In *People v. Olson* (1990), 198 Ill. App. 3d 675, 556 N.E.2d 273, the court held that unregistered overnight guests of the occupant of a hotel room were held to have standing to challenge the search of that room. In reaching its conclusion, the Illinois Appellate Court relied on *Minnesota v. Olson* and on an Illinois Supreme Court decision which held that the fourth amendment applies equally to private residences and hotel rooms. (See *People v. Eichelberger* (1982), 91 Ill. 2d 359, 438 N.E.2d 140.) In the Illinois *Olson* case, the defendant was arrested in bed, sleeping or apparently sleeping, at about 3 or 4 in the morning. The court found this sufficient to establish defendant as an overnight guest at the hotel. Here, there is no indication from the record that defendant was anything more than transitorily on the premises, and thus, defendant has no standing to object to a search of the first-floor premises.

The next issue we address is whether the prosecutor's explanations for the exercise of peremptory challenges against black jurors were legitimate. In *Batson v. Kentucky* (1986), 476 U.S. 79, 82, 90 L. Ed. 2d 69, 77, 106 S. Ct. 1712, 1714, the Supreme Court examined "the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury."

First, the defendant must make out a *prima facie* case by showing that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Batson*, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1721, citing *Washington v. Davis* (1976), 426 U.S. 229, 239-42, 48 L. Ed. 2d 597, 607-09, 96 S. Ct. 2040, 2047-49.) To establish his *prima facie* case, the defendant: (1) must show that he is a member of a cognizable racial group; (2) must demonstrate that the prosecutor exercised his peremptory challenges to remove members of the group; (3) may rely on the fact that peremptory challenges constitute a jury selection practice which permits discrimination by those "who are of a mind to discriminate"; and (4) must show "that these

facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; see also *People v. Mahaffey* (1989), 128 Ill. 2d 388, 412-13, 539 N.E.2d 1172.

The relevant circumstances for a *prima facie* showing include but are not limited to: a disproportionate use of peremptory challenges against blacks; the absence of any common traits among the excluded blacks except their race; and the race of the defendant, the victim, and the witnesses. (*Mahaffey*, 128 Ill. 2d at 413.) Mere numbers do not establish the *prima facie* case. Nor does the fact that a trial court invited the State to give reasons for the questioned challenges. *Mahaffey*, 128 Ill. 2d at 414.

If a court has determined that the defendant failed to meet his *prima facie* burden, this finding will not be overturned unless it is against the manifest weight of the evidence. *Mahaffey*, 128 Ill. 2d at 413, citing *People v. Evans* (1988), 125 Ill. 2d 50, 71, 530 N.E.2d 1360.

Once the defendant has met his *prima facie* burden, the burden shifts and the State must demonstrate that " 'permissible racially neutral selection criteria and procedures have produced the monochromatic result.' " (*Batson*, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1721, quoting *Alexander v. Louisiana* (1972), 405 U.S. 625, 632, 31 L. Ed. 2d 536, 542, 92 S. Ct. 1221, 1226.) The prosecutor must show more than an intuitive judgment that black jurors will favor black defendants. Even so, his explanations "need not rise to the level justifying exercise of a challenge for cause." (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Instead, the prosecutor need only "articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.

The jury traits which may justify a peremptory challenge include but are not limited to: courtroom demeanor, employment status and type of job, connections with those who do criminal defense work, social relationships with judges and lawyers, age, status as renter or homeowner, and arrest record. (*People v. Mack* (1989), 128 Ill. 2d 231, 240-43, 538 N.E.2d 1107.) The State's use of these traits to exclude blacks is not race-neutral if the State retains white veniremen having that same trait and there is no additional trait to distinguish the white veniremen who were retained from the black veniremen who were challenged. On the other hand, prosecutors usually challenge jurors because of a combination of traits, so that a trait that might jus-

tify exclusion of one juror might be acceptable in another who has a different combination of traits. *Mack*, 128 Ill. 2d at 239.

If a trial court has determined that the State met its burden in a *Batson* challenge, the appropriate standard for reviewing the trial court's ruling is whether the court's decision is against the manifest weight of the evidence. (*Mack*, 128 Ill. 2d at 238.) The *Mack* court noted that because " 'the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' " *Mack*, 128 Ill. 2d at 238, quoting *Batson*, 476 U.S. at 98 n. 21, 90 L. Ed. 2d at 89 n. 21, 106 S. Ct. at 1724 n. 21.

■■ The State contends that defendant never made a *prima facie* case in the first instance, and thus defendant may not challenge the sufficiency of the reasons which were proffered to explain the peremptories. In fact, the State did not argue below that a *prima facie* case had not been made out, and the quick answer would appear to be that the State has waived the contention. When defendant objected to the State's exercise of four peremptory challenges against black female prospective jurors, the court requested the prosecutors supply the reasons for the challenges and the prosecutors immediately supplied reasons. It would thus appear that a *prima facie* case was found by the trial judge, and as the State has not pointed to any indication that the trial judge relied only on the number of black jurors excluded, we do not accept the State's contentions.

■■ Likewise, defendant's contention that the trial judge erred in failing to make a specific finding on the legitimacy of the State's reasons should be rejected. An argument could be made that by allowing the trial to commence to conclusion, the trial judge implicitly did find the prosecutors' reasons legitimate. More importantly, defendant never objected to the trial court's rather informal *Batson* hearing below, and again, defendant's motion for a new trial never mentioned the lack of specific finding by the trial court. Thus, defendant has waived this argument.

■■ We remain confronted with the issue of the sufficiency of the proffered reasons. It is important to note that defendant does not take issue with the reasons proffered for two of the venirepersons, namely, that each had relatives convicted of felonies. Rather, the defendant challenges the sufficiency of the stated reasons for peremptorily challenging three prospective jurors. The reasons for exclusion of two of these prospective jurors were the same: the two individuals were some 25 minutes late returning to the court (after lunch) for jury selection. Defendant contends that this is an insufficiently race-

neutral reason for exercising a peremptory challenge. To the contrary, the fact that venirepersons are tardy in returning from lunch, after being ordered to return at a specific time, indeed may shed some doubt as to their ability to listen to and follow directions during the trial. While it may be an "innocent mistake," as defendant contends, we hold that it is one that may race-neutrally and legitimately be interposed as a reason for peremptorily challenging a prospective juror.

The reason as to the fifth juror is a bit more problematic. As to the fifth challenged venireperson, the State stated, "We did not like some of the responses that [she] gave, and some of the looks she was giving the Court and ourselves as opposed to [an accepted juror]. *** Demeanor of that particular juror throughout the proceedings and her attitude toward us." There is no question that the demeanor of a prospective juror may provide a legitimate, race-neutral reason for exclusion of the juror. (See *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453; *People v. Mack* (1989), 128 Ill. 2d 231, 538 N.E.2d 1107; Note, *Illinois Courts Struggle to Evaluate Race-Neutral Explanations for Peremptory Challenges under Batson v. Kentucky* (1988), 22 J. Marshall L. Rev. 235, 241-42.) However, in *Young* and *Mack*, as well as a recent Illinois Supreme Court case, *People v. Morgan* (1991), 142 Ill. 2d 410, more than a bare assertion of demeanor was articulated. The reasons why the prospective juror's demeanor was unacceptable were articulated (*e.g.*, hesitation in response to a question, a casual manner, or answering a question in such a manner as to indicate that the juror had previously reached a "not guilty" verdict). Here, there is no real indication from the State as to what it was about the demeanor of the prospective juror or her answers to the questions that was objectionable. While a more specific answer might be preferable, the appellate court in *People v. Talley* (1987), 152 Ill. App. 3d 971, 987, 504 N.E.2d 1318, held that the following reason was race-neutral and sufficiently specific: The prosecutor "was not too happy with [the juror's] demeanor and how he answered the questions." Thus, under the authority of *Talley*, the proffered reason in the instant case as to the fifth prospective juror is sufficient. A different scenario is presented from the instant case where the State repeatedly asserts "demeanor" as a basis for the exclusion of venirepersons without any further explanation, and the defendant has otherwise shed doubt upon the legitimacy of the proffered reasons (*e.g.*, shown disparate treatment of accepted and excluded jurors). Here, four of the five reasons for exclusion were clearly legitimate. Defendant has not presented any argument whatsoever that white jurors who were accepted shared the characteristics cited by the State for exclusion, which is an

important consideration. (See *People v. McDonald* (1988), 125 Ill. 2d 182, 530 N.E.2d 1351.) The trial judge, whose findings are entitled to great deference, apparently was satisfied with the response from the State, as he did not sustain defendant's objection. Thus, the instant case is a far cry from a case where the record reveals racially discriminatory tactics by the State during *voir dire*.

The next issues we address are whether defendant was denied a fair trial due to evidence and argument relating to (a) the police having read reports of armed robberies that led them to focus on defendant, and the police intensifying their search for defendant after speaking with a tavern robber; (b) the State allowing the presence in the court room of the cart with the name of a well-known gang on it, and a folder which contained the title "Gangs Prosecutions," as well as other implications that codefendants were gang members; and (c) the admission of the mugshots of the codefendants into the jury room.

Defendant contends that she was denied a fair trial due both to the testimony of police officers that after reading reports of other tavern robberies they came up with the last name of "Bass" and after talking to one Willie Anderson, who was in custody for an armed tavern robbery, they "intensified" their search for defendant. With respect to the admissibility of the testimony concerning the police reports, defendant raises two contentions in arguing that the testimony should not have been admissible, namely: (1) that the testimony was inadmissible hearsay; and (2) that the testimony was irrelevant and prejudicial evidence indicative of other criminal activity on the part of the defendant.

In support of her hearsay contention, defendant relies heavily upon the case of *People v. Parrott* (1976), 40 Ill. App. 3d 328, 352 N.E.2d 299. In *Parrot*, however, the evidence was introduced for the truth of the matter asserted, and thus was held to be inadmissible hearsay. We do not perceive a hearsay violation in the instant case. The testimony here was not admitted for the truth of the matter asserted, but only to show why police personnel acted as they did. At different points during much of the testimony defendant complains of, the jury was instructed to consider the testimony only for the limited purpose of showing police personnel conduct, and at the end of the trial, the jury was reminded to follow all limiting instructions. The testimony elicited took two forms, namely: that police personnel, after reviewing a series of police reports involving tavern armed robberies, came up with a person by the last name of defendant's relating to the investigation; and that Detective Bogucki, after speaking with a per-

son named Willie Anderson, "intensified" the search for a subject named Patricia Bass and codefendants.

Defendant argues that the "substance" of the police reports and conversation—that defendant had committed other robberies—was revealed. While that is one damaging inference that can be drawn from the testimony, it is not the only inference that can be drawn. Another inference, for example, can be that defendant was associated with the codefendants (which defendant admitted in her properly admitted confession) and/or that defendant was in the vicinity of the other robberies and might have information about the other crimes. In any event, regardless of the inferences defendant speculates the jury may have drawn from the testimony, the important point is that the testimony was admitted not for the truth of the matter defendant would infer, but rather for the purpose of explaining the actions of police personnel, and thus defendant's objections to the testimony on hearsay grounds is without merit.

■■ Having decided that a hearsay violation did not occur, we next address the issue of whether the complained-of testimony was inadmissible as irrelevant and prejudicial evidence indicative of other criminal activity on the part of defendant. *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, upon which defendant relies, is distinguishable. There, the complained-of testimony related to the presence of a gun (not the gun used to perpetrate the crime defendant was tried for) on defendant's person at the time of arrest, and the fact that a witness' statement had been taken while police personnel were investigating defendant's involvement with other homicides. Here, the testimony was limited to steps the police took in connection with the investigation of the instant case and was admitted only for the purpose of showing the investigation. The question thus becomes whether the testimony as to the police reviewing reports of tavern robberies was relevant to a material issue in this case. A review of the record reveals that during the pretrial discussion of defendant's motion *in limine* to exclude certain of the complained-of evidence, defendant argued that she was arrested on another charge, on a "roust" according to defense counsel. Such appeared to be defendant's theory of the case during the pretrial proceedings on the motion to quash arrest. However, this theory was never once argued to the jury. Defense counsel did not argue or intimate such a theory in counsel's opening statement.

To the extent that the reference to police reports is indicative of other criminal activity, it is axiomatic that such evidence is admissible if going to any relevant, material issue, but not to establish that

defendant committed the crime defendant is charged with. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 564 N.E.2d 803.) The State argues that in this case "it was particularly necessary for [t]he People to explain the detectives' investigatory procedure" because the State "had to provide some explanation for the fact that the detectives went to speak to defendant after she'd been arrested on other charges." In point of fact, the only testimony as to the arrest of defendant was that she was arrested during the execution of a search warrant and that she was not the subject of the search warrant. The State cites no part of the record to support this contention and the record reveals no support for the State's contention.

The State relies heavily on the cases of *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174, and *People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355. In *Byrd,* the court observed: "Informing the triers of fact of consequential steps in the investigation of a crime is a normal procedure and is important to the full presentation of the State's case." (*Byrd,* 43 Ill. App. 3d at 742.) *Byrd* did not, however, involve testimony which could raise the inference that the defendant had participated in other crimes, similar to the crime defendant was charged with. In *Johnson,* the complained-of testimony was relevant to rebut the suggestion of defense counsel that law enforcement personnel had unjustifiably targeted the defendant.

A review of the record leads to the conclusion that it was error to allow the police officers to testify as to the reports of other tavern robberies. While we do not hold that such evidence can never be properly introduced absent a claim such as the defendant's in *Johnson,* we have, as indicated, found no support for the State's argument as to their relevance to a material issue in this case. Moreover, we perceive no other material issue whose resolution benefitted from the admission of the above testimony. Absent a material issue, the testimony should not have been brought to the attention of the trier of fact, given its potential prejudicial effect.

The issue, then, becomes whether the error is reversible error or harmless error. Errors will be held harmless where they could not reasonably have affected the result or contributed to the defendant's conviction. (*People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.) A primary factor in any harmless error analysis is whether the proof of defendant's guilt was overwhelming. (*People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.) Here, the proof of guilt was overwhelming. Defendant confessed in detail to the robbery. Defendant's claim that she confessed to participation in a tavern armed robbery and murder due to fear of her children being taken away is somewhat il-

logical: could defendant reasonably believe that she could confess to armed robbery and murder and not be separated from her children? While testifying, defendant claimed that she did not participate in the robbery but was only told about the robbery by codefendants. Yet, although defendant confessed in great detail about the incident and in a manner that closely resembled the bartender's description of the incident, defendant repeatedly testified that she was not told of many of the details she confessed to by the codefendants. At the police station, defendant herself identified one of the tavern patrons. Thus, the evidence of defendant's guilt was overwhelming. Further, defendant herself admitted when she testified that she had participated in a prior "stick up" of a tavern with a codefendant.

Defendant notes that the State referred to Anderson as a tavern robber himself. While we agree that the references to Anderson as a tavern robber were error, these references by the State took place only in the State's opening statement and closing argument. The State did not bring this out during its case in chief. Rather, defense counsel brought out that Anderson was in custody on a charge of armed robbery. On redirect examination, the State asked Detective Shalk if Anderson gave him additional information regarding this particular armed robbery, and defense counsel's objection to this question was sustained. Objections to the reference to Anderson as a tavern robber were sustained during argument, and the jury was later instructed to consider only the evidence presented and not to consider counsel's comments as evidence. Any error was thus cured and in any event was not reversible.

Defendant also alleges as error the fact that the State in its case in chief referred repeatedly to contacting the "gang crimes" division in the course of its investigation of the case, specifically with regards to a codefendant. Defendant does not contend that the State could not properly refer to the fact that in the course of their investigation police personnel spoke to other police officers in a different crime unit. Rather, defendant appears to complain that the State overly emphasized that the gang crimes unit was contacted. The record reveals that objections to questions involving the investigation were sustained, but for the apparent reason that the questions (which related to why police investigated a codefendant and what police personnel instructed the other police unit) went beyond the admitted purpose of showing investigatory procedures. The objections were sustained, the questions unanswered, and we feel that any error which occurred was sufficiently cured and not reversible error.

■■■ The next evidentiary issue we address is whether reversible error occurred due to the presence of the cart and the folder in the courtroom. Defendant objected to both of these items in the course of the trial. The cart displayed the name of the well-known street gang the "Black Gangster Disciples" in red letters. The file folder was titled "Gangs prosecutions." To be sure, as the State points out, there is only defense counsel's assertion that these items were visible to the members of the jury. However, the State does not deny the existence of these items in the courtroom, and the State conceded below (and makes no contrary argument before us) that the prosecution of defendant had nothing to do with gangs.

These items had no business being in the courtroom where they were even potentially within viewing range of the jurors. The existence of the items leads to the appearance that they were either intentionally or negligently (or both) brought into the courtroom with the effect that, if seen by the trier of fact, prejudice to the defendant in the eyes of the trier of fact could result. The existence of these items can only be considered error. For the reasons that the testimony regarding the police reports was harmless error, however, we do not deem the error reversible. Further, there is no showing in the record that jurors actually saw the items, or if they did, that defendant was prejudiced thereby. We therefore hold that the presence of the cart and the folder was harmless, and not reversible error.

■■■ As to the last evidentiary issue defendant raises, the allowance of the mugshots of codefendants to go back to the jury room, defendant does not contend that they were improper evidence, only that they should not have gone to the jury. Initially, the trial court wondered what the purpose of showing the jury a photograph of a "rough looking" person would serve. Subsequently, the mugshots were allowed to go back to the jury on the theory that they were part of defendant's confession. (Defendant had identified her codefendants' photographs when she confessed.)

While the necessity of the photographs going to the jury might be questioned, as the identification of the codefendants was not an issue at defendant's trial and defendant's relationship with the individuals was clearly established, any error, however, appears to have been minimal. While the same concerns relating to mugshots of defendants would apply to mugshots of witnesses and codefendants (the concern that the mugshot is indicative of other criminal activity on the part of the photographee, see *People v. Hawkins* (1972), 4 Ill. App. 3d 471, 281 N.E.2d 72), defendant has not argued nor does the record reveal that the mugshots contained any information, such as arrest dates or

police department name, that would suggest criminal activity. Thus, we do not consider the introduction of the mugshots to be reversible error.

■■ We next consider whether defendant was denied a fair trial by State argument and testimony on the theme that the victim's American dream was destroyed by the murder. Defendant contends that the State improperly influenced the jury's sympathies by presenting testimony relating to and referring in argument to the relationship and history of the victim and his wife. Specifically, some minimal information was elicited as to the circumstances of the victim meeting his wife and their consequent decision to marry and open the tavern. Likewise, some testimony was elicited that it was the victim's dream to own a tavern, and the State in opening statement and closing argument referred to the victim's dream of owning a tavern and the "American dream."

We are aware, as defendant observes, that counsel may not say or do anything in the course of a trial which has the only effect to inflame the passion or arouse the sympathy of the jury. (See *People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202.) However, we have reviewed the record and conclude that the argument and testimony defendant complains of were sufficiently brief and curtailed so as not to constitute a passionate appeal to the jurors' sympathies, and was a fair comment on the unfortunate circumstances and effect of the incident.

■■ Finally, defendant argues that her sentence was excessive and should be reduced. We disagree and hold that defendant's sentence was not excessive. While defendant argues that defendant was young, grew up in a difficult family situation and had "limited intellectual resources," the trial judge is entitled to considerable deference. Here, the trial court specifically observed that the defendant lacked remorse, which is a factor which may be considered by the trial court. (*People v. Bigsby* (1977), 52 Ill. App. 3d 277, 283, 367 N.E.2d 358.) Given the circumstances of the case, and the trial court's observation as to defendant's lack of remorse, reduction of defendant's murder sentence from 30 to 20 years is not warranted, and we hold that the trial court did not abuse its discretion in sentencing defendant to a 30-year term of imprisonment.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA, J., concurs.

JUSTICE EGAN, specially concurring:

It is my impression that one of the most often-recurring assignments of error before courts of review in this State involves the prosecution's claim that certain evidence is admissible to explain the narrative of events leading up to a defendant's arrest. That claim is made here to refute the defendant's argument that the testimony of Officer Bogucki violated the general rule against proof of other crimes. The majority recognize that the evidence was improper here, and I agree.

Some appellate court opinions have recognized an exception to the general rule barring proof of other crimes when the evidence is offered to provide a narrative of events leading up to the defendant's arrest. (See, *e.g.*, *People v. Hunley* (1989), 189 Ill. App. 3d 24, 545 N.E.2d 188; *People v. Goka* (1983), 119 Ill. App. 3d 1024, 458 N.E.2d 26; but see contra *People v. Spiezio* (1982), 105 Ill. App. 3d 769, 434 N.E.2d 837.) I concur specially to emphasize that any such appellate court authority is contrary to the pronouncements of our supreme court.

To my knowledge, no preeminent authority on evidence (*e.g.*, Wigmore, McCormick, Wharton, Cleary or Graham) has ever recognized such an exception. That exception is not specified in Corpus Juris Secundum (see 23 C.J.S. *Criminal Law* §§825 through 832 (1989)) nor in American Jurisprudence (see 29 Am. Jur. 2d *Evidence* §§320 through 333 (1967)). Most important, however, our supreme court has expressly refused to recognize such an exception to the general rule denying admissibility of other offenses.

In *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59, the supreme court held that the evidence of a subsequent crime was admissible to establish intent. The court referred to *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821, as approval of the admission of evidence of a subsequent robbery in a trial for murder and armed robbery in order to show "the defendant's intent and the context of his arrest." (*Bartall*, 98 Ill. 2d at 310.) However, in *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612, the supreme court held inadmissible evidence of an armed robbery two years after the crime for which the defendant was on trial. The State argued that the evidence was admissible to show the circumstances leading up to the defendant's arrest, citing *McKibbins*. To that argument the supreme court spoke as follows:

"Although the People assert numerous grounds for admitting evidence of the May 4, 1982, armed robbery, we find no justifiable basis for its admission. Contrary to the People's assertion, *the evidence was not admissible merely to show how the investi-*

*gation unfolded and how defendant came into custody.* These purported bases for admission beg the critical question of relevance to prove defendant's commission of the crimes in issue *and are not supported by our prior decisions.* For example, in *People v. McKibbins* (1983), 96 Ill. 2d 176, cited by the People, this court affirmed the admission of evidence detailing the events of the defendant's arrest when discovered in the act of robbing a jewelry store, *but only where the evidence was also relevant to specifically connect the defendant with the crimes for which he was being tried,* a robbery and murder which had occurred two days earlier. (96 Ill. 2d at 184.) The circumstances of the jewelry store robbery tended to establish that the defendant had participated in the earlier murder with the necessary criminal intent. (96 Ill. 2d at 186.)'' (Emphasis added.) 123 Ill. 2d at 342.

The court held that the error was harmless and affirmed the judgment. Justice Clark dissented from the affirmance; he did not agree that the error was harmless and added this observation:

"The majority concedes that there was 'no justifiable basis' for the State's introduction of evidence of the May 4, 1982, armed robbery. (123 Ill. 2d at 342.) Indeed, the evidence did not tend to prove identity, knowledge, motive, opportunity, or any other fact in issue. Nor was the evidence of the May 1982 offense admissible to show how the defendant was apprehended, as the State otherwise argues. *Our decisions have never recognized such an exception to the general rule* requiring that other-crimes evidence be excluded." (Emphasis added.) 123 Ill. 2d at 367 (Clark, J., dissenting).

As noted by the majority, the defendant may open the door for the admission of evidence of another crime (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355); and evidence of another crime may be admitted when showing resistance to an arrest. *People v. Sustak* (1958), 15 Ill. 2d 115, 153 N.E.2d 849.

I agree with the majority that the verdict would have been no different if the improper evidence had been excluded. The defendant's confession was entirely consistent with and corroborated the testimony of the occurrence witnesses. In this regard, this case is distinguishable from the cases cited by the defendant, *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222, and *People v. Johnson* (1990), 202 Ill. App. 3d 417, 559 N.E.2d 1041. In addition, the State's case in both *Mullen* and *Johnson* contained other infirmities not present here.

Officer Bogucki's testimony that after speaking to Willie Anderson he began to look for Patricia Bass did not violate the hearsay rule. He did not testify to the contents of his conversation with Anderson. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.) However, I express no view on the question of whether the hearsay rule was violated by Bogucki's testimony that he examined police reports of other robberies and the defendant's name surfaced.