THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY CAMPBELL, Defendant-Appellant.

First District (3rd Division)    No. 1—88—3289

Opinion filed December 30, 1992.

Rita A. Fry, Public Defender, of Chicago (Henry L. Hams, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall

Roberts, and Robyn Berman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant, Anthony Campbell, was found guilty of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) and aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—4). Defendant was sentenced to concurrent terms of 30 years' imprisonment for murder and 5 years' imprisonment for aggravated battery.

The issues before this court for review are (1) whether defendant received ineffective assistance of counsel prior to trial when defense counsel instructed a certain witness to ignore a subpoena; (2) whether the trial court erred when it denied defendant's motion to dismiss members of the venire because they clapped and laughed at the end of defense counsel's questioning of a certain venireperson during *voir dire*; (3) whether defendant received ineffective assistance of counsel when defense counsel moved to strike a venireperson in the presence of the venire, in violation of the trial court's instructions; (4) whether the trial court erred when it admonished defense counsel in the presence of the venire; (5) whether the trial court erred in denying defendant's challenge for cause to excuse a certain venireperson; (6) whether defendant received ineffective assistance of counsel when defense counsel failed to question each member of the venire concerning alleged communication between members of the victim's family and certain venirepersons; (7) whether defendant received ineffective assistance of counsel when defense counsel argued with the trial judge in order to make a record of his objection to the length of *voir dire*, to make a record of his recollection of the judge's statements on the previous day concerning the length of *voir dire*, and to make a record of his objection to the trial court's ruling on his motion for a mistrial; (8) whether the trial court erred in permitting the State to exercise a peremptory challenge to excuse a certain venireperson; (9) whether defendant received ineffective assistance of counsel when defense counsel asked members of the venire hypothetical questions during *voir dire*; (10) whether defendant received ineffective assistance of counsel because defense counsel failed to make a record of the race of each venireperson; (11) whether defendant received ineffective assistance of counsel because defense counsel failed to raise the defense of voluntary intoxication; (12) whether defendant received ineffective assistance of counsel when defense counsel conducted the direct examination of a certain witness; (13) whether the trial court erred in refusing to admonish a particular witness during his cross-examination by the defense; (14) whether de-

fendant received ineffective assistance of counsel when his defense attorney allegedly called a witness an obscene name; (15) whether defendant received ineffective assistance of counsel when defense counsel objected to the trial judge's evidentiary publication procedure for the jury; (16) whether defendant was denied a fair trial due to alleged prosecutorial misconduct during closing arguments; (17) whether defendant received ineffective assistance of counsel when defense counsel stated during closing arguments that defendant intended to "hurt" the decedent; and (18) whether the cumulative effect of the alleged errors at trial deprived defendant of his constitutional right to a fair trial and due process of law. We affirm.

Detective John Robertson and his partner arrived at Theresa's Lounge on 43rd Street in Chicago, Illinois, at 1 a.m. on June 14, 1986, to investigate a stabbing. The detectives observed a woman, later identified as Walter Mae Jones, lying on the floor near the women's washroom. Jones was dead. Dr. Barry Lifschultz, a forensic pathologist, later testified that he found 13 stab wounds in Jones' body. Jones had been stabbed in her head, chest, abdomen and arms. Dr. Lifschultz testified that Jones died as a result of all of these wounds. Detective Robertson then interviewed witnesses at the lounge. Witnesses told him that defendant stabbed Jones and William King.

King was admitted to Billings Hospital following the incident. Dr. Kambiz Dowlatshahi later testified that he performed surgery on King in order to treat lacerations in his liver, left ear and back. Detective Robertson visited King in the emergency room of Billings Hospital, where he obtained King's shirt and undershirt which had holes in it that were consistent with the stab wounds he received.

Detective Robertson later testified that upon leaving the hospital, he and his partner went to defendant's parents' home whereupon they agreed to help him find defendant. Defendant's parents told Detective Robertson that defendant was probably visiting his friend Moses Jones, who resided at 8014 South Bishop in Chicago, Illinois. Detective Robertson telephoned defendant at Moses Jones' home at approximately 2 a.m. Detective Robertson testified that defendant agreed to surrender to the police during this telephone conversation. Detective Robertson stated that defendant asked him to park his squad car at 79th and Loomis, in Chicago, Illinois, to identify himself by placing a package of cigarettes on top of the vehicle and to wait until he came outside. Detective Robertson followed defendant's instructions.

After a short time, defendant approached the squad car and identified himself. Detective Robertson then arrested defendant and

read him his *Miranda* rights. Detective Robertson testified that defendant indicated that he understood his rights, and that he then agreed to show the police where he had hidden the murder weapon. Defendant subsequently directed the police to a grassy area adjacent to a senior citizens home located at 740 East 43rd Street in Chicago, Illinois, where the weapon was found and recovered. Detective Robertson testified that at the time of defendant's arrest there was nothing unusual about the manner in which defendant was talking or walking, that his breath did not smell of alcohol and that he did not appear to be under the influence of drugs. Defendant was then taken into custody at Area 1 police headquarters.

Upon returning to the station, the police discovered that defendant was wearing two sets of clothing in the form of one sweat suit layered over another. Detective Robertson advised defendant of his *Miranda* rights again. Detective Robertson then interviewed defendant whereupon defendant gave him an account of the stabbing. Detective Robertson later testified concerning this conversation. Detective Robertson testified that defendant told him that during the evening of June 14, 1986, he left his mother's house and was walking west on 43rd Street when he saw Jones standing near Annie and Morris Payne's vehicle, which was parked outside of Theresa's Lounge. Defendant said that he went inside the bar and asked Jones if she would come outside and talk to him, but she refused. Detective Robertson testified that defendant then said that he walked back to the door to pay the $2 cover charge and then returned to Jones' table. Defendant told Detective Robertson that upon returning to the table, he removed a knife from his knapsack and used it to stab Jones. Defendant then stated that Jones' new boyfriend, William King, picked up a chair and swung it in his direction, knocking off his hat and sunglasses. Defendant told Detective Robertson that he then left the tavern but returned shortly thereafter to retrieve his hat and glasses. Defendant told Detective Robertson that he stabbed King again upon returning to the bar. Defendant then told Detective Robertson that past problems in his relationship with Jones had made him angry. Defendant again told the detective that he hid the knife near a senior citizens home after the stabbing and he admitted that he layered clothes which he was carrying in his knapsack over the clothes that he was already wearing. Defendant told Detective Robertson that he then rode a number "4 Cottage Grove" Chicago Transit Authority (CTA) bus to Moses Jones' house. After the interview, defendant was placed in a lineup whereupon he was identified by Kermit LeFlore, a bartender at Theresa's Lounge.

Shortly thereafter, Assistant State's Attorney Harry Devereaux

interviewed defendant. Assistant State's Attorney Devereaux later testified that defendant appeared to be alert and comfortable during the interview. Assistant State's Attorney Devereaux summoned a court reporter who recorded defendant's statement. Defendant's statement was substantially similar to the description of the incident that he previously related to Detective Robertson. King, Annie Payne and Morris Payne, Jones' aunt and uncle, later testified regarding the stabbing. Their testimony was substantially similar to defendant's account of the incident which he related to Detective Robertson and the court reporter.

Defendant was charged by indictment with two counts of first degree murder, one count of attempted murder, two counts of armed violence and two counts of aggravated battery.

Prior to trial, the court told defense counsel that it resented his instructing Dr. Gaspero not to honor a subpoena. After an argument regarding the issue, the trial judge said: "You're interfering. You better hope that this case is never reviewed." When defense counsel noted that he was offended by the trial judge's comment, the judge threatened to hold him in contempt of court and impose sanctions upon him. The court then commenced *voir dire*.

At the beginning of *voir dire*, the court, the defense and the prosecution all questioned members of the venire. The trial judge asked prospective juror Mary O'Donnell if she could apply the insanity defense to the present case even if the State were to prove that defendant committed murder beyond a reasonable doubt. O'Donnell replied: "Yes." When questioned by the court concerning the matter again, O'Donnell affirmed that she would sign a "not guilty" verdict form if the defense proved that defendant was insane at the time he killed Jones. Following the trial court's questions, the State interviewed O'Donnell, whereupon O'Donnell testified that she would be able to consider all of the evidence and follow the judge's instructions. When defense counsel questioned O'Donnell, however, she stated that she could not be an objective juror and that if she were defendant, she would not want a person like herself to serve as a juror. Defense counsel moved that O'Donnell be stricken for cause.

The trial judge responded by calling a recess whereupon he announced that he would question the jurors himself since defense counsel asked questions in a confusing manner and because "too much law was interjected in the questions." Subsequently the court questioned O'Donnell. In response to questioning, O'Donnell reminded the court that she indicated prior to the recess that she could not judge the case fairly—and that her previous response was still her opinion. Upon subsequent questioning by defense counsel,

O'Donnell again stated that she could not be an impartial juror. Finally, upon further questioning by the court, O'Donnell stated that she could be fair to both parties in the case including defendant.

Defense counsel then rearticulated his motion to exclude O'Donnell from the venire for cause on the basis that she testified that she could not give defendant a fair trial. The State replied that while O'Donnell admitted that she found some of the questions the attorneys asked her to be confusing, she did say that she could be fair to both the State and defendant.

Defense counsel also moved to excuse all of the remaining venirepersons on the basis that several potential jurors clapped and laughed loudly in response to his statement that he had no further questions for O'Donnell. Defense counsel also argued that the venire should be excused because the trial judge told him that he was "disappointed" with him in the presence of the venire. Both of defendant's motions were denied and defense counsel exercised a peremptory challenge to strike O'Donnell.

After O'Donnell was stricken from the venire, a Cook County sheriff entered the courtroom and informed the judge that certain venirepersons who had been standing outside of the courtroom in the hall were angry and upset because they had been waiting for a long period of time. Defense counsel also informed the judge that members of Jones' family were talking to certain venirepersons. Defense counsel then requested a recess. The trial judge responded by stating that he would call a recess in one hour.

Two of Jones' family members and a family friend were then sworn in and questioned out of the presence of the venire. First, defense counsel questioned Lucy Clark, the decedent's mother, concerning alleged conversations that she had with certain venirepersons in the hall outside of the courtroom. Clark replied that at one point she exited the courtroom and a woman, who was not wearing a red juror badge, asked her if she was there for court. Clark testified that she told the woman that she was and that her feet hurt. Clark also testified that someone asked her what she was looking for and she replied, "her lawyer." Clark further testified that she did not tell anyone that she was a witness or that defendant killed her daughter. Juanita Clark, the victim's daughter, and Stanley Reed, a family friend, both testified that they never conversed with any member of the venire. Following their testimony, defense counsel moved for a mistrial on the basis that members of the decedent's family were in the presence of certain venirepersons. He also moved that the trial court dismiss the venire to alleviate the prejudicial effects of any impropriety that may exist. Defense counsel's motions were denied.

One hour later, defense counsel again requested a recess. The trial judge responded by admonishing defense counsel to "pay attention." After the trial judge's comment, the following remarks were made by certain venirepersons:

"[A VENIREPERSON]: This is stupid and ridiculous. We stood in the hall for two hours this morning already.

ANOTHER [VENIREPERSON]: Hey, what is this?

[A THIRD VENIREPERSON]: In case you people don't care we have been sitting around here since 10:30. I have an ulcer, I haven't eaten and it is hurting.

[A FOURTH VENIREPERSON]: It is storming outside and I am riding public transportation."

Later, the trial judge stated:

"I have a lot of cases on my call. I want to proceed. We only need one more juror to get this panel. I want to get this panel. When we get this panel, then we will break."

Subsequently, a venireperson later identified as Ms. Kessler said:

"You know, this is very hard, Judge. I have high blood pressure and you are making it higher. We have been here all day. We are tired and exhausted. It is just very hard to go up there and sit again. I won't do it."

After further questions by the court and arguments by defense counsel, the trial court adjourned for the evening.

On the following day, out of the presence of the venire, defense counsel objected to the manner in which the judge conducted *voir dire*. Defense counsel noted that venireperson Kessler had been hospitalized and he attributed her hospitalization to having to wait long hours during *voir dire* without food or rest. Subsequently, defense counsel and the trial judge disagreed over whether the judge stated that he wanted to continue the proceedings on the previous evening after Kessler announced that she was tired. The trial judge told defense counsel that his memory was "extraordinarily poor to say the least." Defense counsel responded to the court's allegation by repeatedly stating for the record that the judge wanted to continue the proceedings in spite of complaints made by certain members of the venire. The trial judge then held defense counsel in contempt of court. When supervisors from the public defender's office appeared in court, the trial judge informed them that defense counsel was in civil contempt. Defense counsel later moved for a mistrial on the basis that defendant's sixth amendment right to counsel had been violated when he was held in contempt of court. Arguments were made in support of his motion and the motion was denied.

After *voir dire* resumed, venirepersons Jean Johnson and Joanne Miller were questioned. Johnson testified that she was a social worker

and a teacher of mentally retarded children. Johnson told the court that she had a bachelor's degree in social work and a master's degree in inner city studies. Johnson testified that she had seven children and that she enjoyed swimming, reading, growing plants, bodybuilding and listening to records. Johnson, when asked where she preferred to spend her vacations, told the court that she had once vacationed in West Africa. Johnson testified that she once served as a juror in a criminal case and that she could be a fair and impartial juror in the present case. The State exercised a peremptory challenge to remove Johnson from the venire.

Defense counsel responded by making a motion for a hearing pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, in order that he might establish that the State's use of a peremptory challenge to strike Johnson from the venire constituted a *prima facie* case of racial discrimination.

Miller was then questioned. Miller testified that she worked as a special education teacher on the west side of Chicago. Miller told the court that she had two children. Miller testified that she earned a bachelor's degree in education and a master's degree in special education. Miller stated that she enjoyed swimming, reading, playing tennis and traveling. When Miller was asked where she liked to spend her vacations, she replied: "Europe." Like Johnson, Miller testified that she could be a fair and impartial juror in the present case and that she had served as a juror in a previous criminal case. Miller was accepted as a juror.

Defense counsel then argued in support of his *Batson* motion. Defense counsel contended that the only difference between Johnson, who was stricken from the venire, and Miller, who was returned, was race. The defense argued that the State "kicked off a black lady and kept the white lady [who] had the same credentials." The trial judge denied defendant's *Batson* motion on the basis that the State had given race-neutral explanations for exercising a peremptory challenge to strike Johnson from the venire. Later, the judge noted for the record that the jury consisted of five black females and one black male, and that there was one black male alternate juror.

After the trial court ruled on defendant's *Batson* motion, the trial judge met with the attorneys *in camera* to discuss the procedure for publishing evidence to the jury. The trial judge wanted each juror to examine an item in evidence and then pass it on to the next juror. Defense counsel objected to the procedure on the basis that it was a "cover" and a "rouse [*sic*] to fill time." Defense counsel argued that the publication procedure was lengthy, unnecessary and prejudicial. The trial court overruled defense counsel's objection. After the trial

judge overruled defense counsel's objection, defense counsel acquiesced and he said: "Very good, your Honor. May we proceed?" The case proceeded to trial.

During the trial, Moses Jones testified that defendant came to his house following the stabbings around midnight on June 14, 1986. Jones testified that defendant walked and spoke in a normal fashion.

Defendant then testified on his own behalf. Defendant told the court that he began having a sexual relationship with Jones, the decedent, during the summer of 1979. Defendant testified that he was a 14-year-old high school student and Jones was a 26-year-old woman when the two began having a sexual relationship. Defendant told the court that he moved in with Jones in 1981 and that the two cohabited periodically over the course of the next five years. Defendant also stated that Jones occasionally gave him Valium, cocaine, marijuana and alcohol. Defendant testified that he used drugs daily while he was involved with Jones except during the football season since he was a member of his high school football team. Defendant maintained that his drug use increased after he sustained an injury which ended his high school football career and foreclosed his chances of becoming a professional football player. Defendant also testified that he and Jones had engaged in physical altercations while they lived together. Defendant testified that he occasionally hit Jones and that she had also hit him. In the spring of 1984, defendant was hospitalized after he attempted to commit suicide.

Defendant testified that he drank alcohol, ingested cocaine, smoked marijuana and smoked "happy sticks" (marijuana cigarettes coated in phencyclidine hydrochloride (PCP)), during the evening of June 13, 1986. At one point during the trial, the trial judge mentioned to defense counsel that he had introduced evidence which might support a defense of voluntary intoxication to the murder charge. Defense counsel, however, stated that he did not intend to raise the defense on defendant's behalf. Defendant also testified that he had a knife with him when he left his mother's house on the date in question. Defendant, however, maintained that he did not recall stabbing Jones or King, or speaking to Detective Robertson prior to his arrest.

Dr. Anthony Gaspero, Dr. Matthew Markos and Clifford Contreras all testified regarding defendant's mental condition on the date of the stabbing. Contreras testified for the defense. Contreras told the court that he interviewed defendant while defendant was in custody and that defendant indicated that he was suicidal. Contreras admitted, however, that he believed that defendant was lying about feeling suicidal.

Next, Dr. Anthony Gaspero, an expert in the field of clinical psychology, testified that he interviewed defendant on May 15, 1987. Dr. Gaspero testified that he diagnosed defendant as being alcohol dependent and as having a borderline personality disorder consisting of mood swings and disturbances in personal relationships. Dr. Gaspero opined that on June 13, 1986, defendant was not able to conform his conduct to the requirements of the law. He based this opinion upon defendant's social history, his performance on a Minnesota Multiphastic Personality Inventory test (MMPI) and his score on a Rotter test. Both tests were administered by Philip Wilburn, a psychiatric social worker and a testifying witness. Dr. Gaspero admitted that he neither ordered medical tests for defendant, nor conducted alcohol or drug tests upon him.

Dr. Matthew Markos, a forensic psychiatrist employed by the circuit court of Cook County, testified that he examined defendant on September 15, 1987, at which time defendant was calm and cooperative. Dr. Markos further testified that defendant recalled incidents prior to and after the stabbing, but that he claimed he could not remember stabbing Jones. Dr. Markos testified that he diagnosed defendant as having an anti-social personality disorder with narcissistic traits, but that based upon his psychiatric examination of defendant and his review of police reports and other relevant information, defendant was not suffering from a serious mental disease or defect on June 13, 1986, which would have diminished his ability to appreciate the criminality of his alleged actions or impaired his ability to conform his behavior to the requirements of the law. In addition, Dr. Markos noted that he did not believe that defendant experienced "any serious problems from PCP ingestion." Dr. Markos stated that if defendant had been under the influence of PCP on June 13, 1986, he would not have been able to execute a series of coordinated actions such as stabbing the victims.

Defense counsel, during his cross-examination of Dr. Markos, asked him if it was important for a therapist to consider cultural differences between himself and his patient, and whether Dr. Markos had grown up in a Chicago housing project. Defense counsel then noted that defendant was African-American and that Dr. Markos was from India. Dr. Markos responded by accusing defense counsel of being "unprofessional." Despite a request by defense counsel, the trial judge declined to instruct Dr. Markos not to make unsolicited comments. Later, out of the jury's presence, the trial judge noted for the record that Dr. Markos accused defense counsel of calling him a "fuckin' asshole" on two occasions.

After the close of the evidence, the State and the defense made

closing arguments. During the State's closing argument, the prosecuting attorney stated that "[t]he defendant went to three different places looking for Walter Mae Jones. He told us that in his statement."

Regarding evidence of defendant's insanity, the State said:

"When Dr. Markos testified that he gave you an opinion within his professional opinion that the defendant at the time of the offense was not suffering from a substantial disorder. *** Search your memories as to whether or not Gaspero gave you such an opinion, and when you look through your memory and your recollection of the facts, you will find that he did not give you any such opinion."

Defense counsel's objection to this comment was overruled.

In an attempt to explain defendant's insanity, defense counsel argued to the jury:

"Can you imagine his walking back in, staring at her, looking at her, that is insanity. That is as insane as coming back for his glasses and hat. If someone tells you that is purposeful and goal directed, then ask him about the two dollars, ask him about him saying, 'I would like my two dollars back.' It's insanity. It's not purposeful other than what you have heard from Dr. Markos about, well, he didn't get the services he paid his two dollars for. That's insane, just like the slashed tires shows you that he didn't have a purpose. *I will grant you that his intention was that he wanted to hurt Walter Mae Jones.* The reason he wanted to hurt her is because she had hurt him, and this pain had been going on for seven years. He learned this in his development. He learned it through her in other ways that you heard about. He goes back outside to flatten the tires. Revenge, childish, silly. Certainly childish, but its [*sic*] insane at the same time, absolutely insane that he would do that. Does that show you purposeful, goal directed, well motivated type of individual that Dr. Markos talked about? Please." (Emphasis added.)

Regarding his questioning of Dr. Markos regarding the impact of race upon a psychiatrist's view of his patient, defense counsel stated: "I was not asking him about cultural discrimination, about biases that any examiner brings to an examination. *** You have to be able to understand each other and know where each other is coming from. It's just a matter of understanding what the facts are." Defense counsel also told the jury that "all factors must be taken into consideration, differences in background, whether black or white, Indian."

In response, the State made the following comments with respect to the defense:

"It is offensive to believe that the defense is asking you to say that this defendant was black and was brought up poor in the projects and has no idea of what is right from wrong just because he is black and just because he is poor and just because he was brought up in the projects. That he doesn't know what is right from what is wrong. That is outrageous."

Subsequently, the jury found defendant guilty of murder and aggravated battery. The trial court sentenced defendant to concurrent terms of 30 years' imprisonment for murder and 5 years' imprisonment for aggravated battery. This appeal followed.

First, defendant complains that he was denied effective assistance of counsel when defense counsel instructed Dr. Gaspero, a witness, not to honor the trial judge's subpoena. Defendant maintains that this action was antagonistic towards the court. The State maintains that defendant has waived his right to appellate review of the question of whether he received ineffective assistance of counsel since defense counsel failed to mention the issue in his post-trial motion. In the alternative, the State argues that defendant had the benefit of effective assistance of counsel because defense counsel's conduct fell within the range of reasonable professional assistance and because the outcome of the case would remain the same even if defense counsel had not instructed the witness to ignore the subpoena.

The doctrine of waiver applies to claims of ineffective assistance of counsel. (*People v. Keys* (1990), 195 Ill. App. 3d 370, 372-76, 552 N.E.2d 285, 287-89.) The waiver rule provides that a party must preserve his right to appellate review of any alleged errors at trial by objecting to the alleged impropriety in a timely manner and by mentioning the specific objection in a post-trial motion. Otherwise, the party waives his right to appellate review of an alleged error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124, 1129-32.) Illinois Supreme Court Rule 615(a), however, provides as follows: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (134 Ill. 2d R. 615(a).) Plain error encompasses those errors which are obvious, which affect the substantial rights of the accused, and which if uncorrected, would be an affront to the integrity and reputation of the judicial system. *People v. Stuckey* (1992), 231 Ill. App. 3d 550, 568, 596 N.E.2d 646, 658-59. See also *People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 461, 471; *People v. Bass* (1991), 220 Ill. App. 3d 230, 239, 580 N.E.2d 1274, 1280.

The standard of quality for an attorney's advocacy is that of reasonably effective assistance pursuant to prevailing professional

norms. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65.) In order for a defendant to prove that he received ineffective assistance of counsel sufficient to warrant the reversal of his conviction, the defendant must demonstrate that his counsel made errors so grave and that his counsel's performance was so deficient that counsel did not function in a manner commensurate with the sixth amendment standard for legal representation. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In order to establish that defense counsel was deficient, a defendant must overcome the strong presumption that the disputed action or inaction by defense counsel was merely trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) A review of a lawyer's competency will not extend to the exercise of his judgment, discretion, trial tactics and trial strategy. (*People v. Sowinski* (1986), 148 Ill. App. 3d 231, 246, 498 N.E.2d 650, 659.) Even if a defendant is able to overcome the presumption that a disputed action or inaction was defense counsel's trial strategy and establish that his attorney's performance was deficient, he must still demonstrate that he was prejudiced by defense counsel's error (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65), and that there was a reasonable probability that but for said error, the fact finder would have had a reasonable doubt concerning his guilt. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

In the present case, defendant failed to object to the above alleged error at trial and failed to mention it in his post-trial motion. Defendant has failed to preserve this issue for review. In addition, there is no evidence that the alleged error made by defense counsel amounts to plain error. In order for defendant to prove that his attorney's conduct constituted plain error, defendant must show that he was prejudiced by his attorney's action and that absent this occurrence, the jury would have had a reasonable doubt concerning his guilt. Defendant has failed to meet his burden of proof. A thorough reading of the record shows that defense counsel believed that he had reached an agreement with the State concerning the discoverability of certain material in Dr. Gaspero's possession. Specifically, defense counsel was under the impression that the State agreed to waive Dr. Gaspero's presence at trial if certain material in his custody was tendered to the State. Defense counsel related to the trial court that he told Dr. Gaspero, in the presence of an assistant State's Attorney, that the parties would take care of the matter and that his presence in court was not necessary. After a careful review of the record, we find that defendant has failed to prove that he

suffered any prejudice due to his attorney's misunderstanding. Any alleged error was cured when Dr. Gaspero appeared in court pursuant to the subpoena. We therefore cannot say that defense counsel's action constituted plain error, as there is no evidence that defendant's substantial rights were adversely affected and because defense counsel's action, as it stands, is not an affront to the integrity and reputation of judicial proceedings. The waiver rule therefore applies to defendant's allegation of ineffective assistance of counsel when his attorney instructed Dr. Gaspero to ignore a subpoena.

The second issue before this court is whether the trial court erred when it denied defense counsel's motion to excuse certain venirepersons. Defendant contends that the trial court erred when it denied his motion to dismiss certain members of the venire after they clapped and laughed when defense counsel stated that he had no further questions for venireperson O'Donnell. The State maintains that the trial court's ruling on defendant's motion was proper.

The determination of whether a venireperson is able to give the accused a fair and impartial trial is within the sound determination of the trial court, and that determination will not be set aside unless it is against the manifest weight of the evidence. (*Huelsmann v. Berkowitz* (1991), 210 Ill. App. 3d 806, 812, 568 N.E.2d 1373, 1378; *People ex rel. Hatch v. Elrod* (1989), 190 Ill. App. 3d 1004, 1017, 547 N.E.2d 1264, 1271.) In order for a determination of this nature to be judged contrary to the manifest weight of the evidence on appeal, the party objecting to the venireperson in question must prove that he was prejudiced by the judge's handling of the matter. *People ex rel. Hatch*, 190 Ill. App. 3d at 1017, 547 N.E.2d at 1271.

In the present case, defendant has failed to demonstrate that there was any bias or prejudice toward him or defense counsel on the part of the venirepersons in question. The record shows that the trial judge denied defendant's motion on the basis that he did not hear the alleged reaction from the venire. Accordingly, the trial judge's denial of defendant's motion was not plain error.

Third, defendant alleges that he was denied effective assistance of counsel when his attorney violated the trial court's instruction not to move to strike venirepersons in the presence of the venire. Defendant has failed to preserve this issue for review. In order for this court to find that the defense counsel's conduct constituted plain error, defendant must demonstrate that he was prejudiced by his attorney's action and that, absent this event, the jury would have had a reasonable doubt with respect to his guilt.

In the present case, the trial judge asked both the State and the defense not to articulate any objections they may have regarding a

prospective juror until they were out of the presence of the venire. A review of the record shows that defendant was not prejudiced by the complained-of incident. During *voir dire*, defense counsel asked a certain venireperson if she could find defendant innocent if the State failed to prove beyond a reasonable doubt that defendant had requisite mental state which was an element of the crime. After the venireperson answered the question, defense counsel moved that she be excused for cause in the presence of the venire. Defense counsel then apologized to the trial judge for violating the court's rule. The trial judge accepted his apology. We find that any prejudice caused by the event was cured by defense counsel's apology and the trial court's acceptance of his apology. We also conclude that absent this event, the jury still would have found defendant guilty of murder and aggravated battery. Accordingly, we conclude that defense counsel's statement did not constitute plain error since defendant's substantial rights were not affected by the statement, and because the alleged error was not an affront to the integrity and reputation of the judicial proceedings.

The next issue before this court is whether the trial judge erred in admonishing defense counsel in front of the venire. Defendant alleges that the trial judge erred when he told defense counsel that he was disappointed in him in the presence of the venire. The record shows that during *voir dire*, defense counsel asked potential jurors about their beliefs and opinions concerning the defense of voluntary intoxication when it was not raised as an affirmative defense, after the trial court had already warned defense counsel to curtail that line of questioning. When defense counsel questioned a venireperson concerning the voluntary intoxication defense, the trial court sustained an objection by the State and said: "Counsel, please, I'm very disappointed." In order for comments by a judge to constitute reversible error, a defendant must show that the remarks in question were prejudicial and that he was harmed by them. (*People v. Garcia* (1988), 169 Ill. App. 3d 618, 622-23, 523 N.E.2d 992, 995.) In the present case, defendant has failed to make such a showing. Accordingly, there was no reversible error on the part of the trial court.

Next, defendant maintains that his conviction should be reversed and his cause remanded for a new trial because the trial court erred in denying his motion to dismiss venireperson O'Donnell for cause. The State maintains that defendant has failed to properly preserve this issue for appellate review. We agree.

The waiver rule governs alleged errors made during *voir dire*. (*People v. Tucker* (1989), 186 Ill. App. 3d 683, 688-90, 542 N.E.2d 804, 808-09.) The record shows that defendant objected to the trial court's

denial of his motion to dismiss venireperson O'Donnell for cause but he failed to mention the objection in his post-trial motion. As we noted above, a written post-trial motion mentioning the objection is also required to preserve an issue for appellate review, otherwise the issue is waived. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124, 1129-32.) We cannot review the merits of defendant's allegation of error by the trial court because defendant did not preserve the issue for review, and because there is no evidence that the alleged error constituted plain error.

The trial judge is afforded broad discretion during *voir dire*. (*People v. Johnson* (1987), 162 Ill. App. 3d 952, 953, 516 N.E.2d 343, 344.) The determination of whether or not to allow a challenge for cause is within the sound discretion of the trial court. (*People v. Hyche* (1979), 77 Ill. 2d 229, 239, 396 N.E.2d 6, 11; *People v. Harris* (1967), 38 Ill. 2d 552, 556, 232 N.E.2d 721, 723.) Although the trial court may have erred when it declined to allow defendant to dismiss venireperson O'Donnell for cause, defense counsel then exercised a peremptory challenge to strike O'Donnell, thereby rendering the trial court's error harmless. (See *Johnson*, 162 Ill. App. 3d at 953-54, 516 N.E.2d at 344-45.) Accordingly, we cannot review the merits of this issue.

Furthermore, we cannot address the merits of defendant's claim that he received ineffective assistance of counsel when his attorney failed to ask each of the venirepersons whether or not he or she had spoken to members of the decedent's family during *voir dire*. We cannot review this issue because defendant failed to properly preserve the question for appellate review and because defense counsel's inaction does not constitute plain error. In order for this court to find that the defense attorney's inaction constituted plain error, defendant must overcome the strong presumption that his counsel's failure to question each remaining venireperson concerning his or her contact with the decedent's family was not trial strategy.

Defendant has failed to demonstrate that defense counsel's inaction was not part of his trial strategy. The record shows that defense counsel moved for a mistrial on the basis that defendant told him that Lucy Clark spoke to certain venirepersons. He also asked the trial court to dismiss the venire due to any impropriety that may exist. Although defense counsel could have questioned each venireperson concerning his or her alleged interaction with members of the decedent's family after the motion was denied, defendant was not prejudiced by defense counsel's inaction since defense counsel moved for a mistrial as well as for the dismissal of the entire venire. His inaction, therefore, did not constitute plain error as there is no evi-

dence that defendant was prejudiced or that his substantial rights were abridged by defense counsel's failure to question the remaining venirepersons regarding their contact with the decedent's relatives.

Defendant next argues that he received ineffective assistance of counsel when defense counsel antagonized the court by attempting to make a record of his objection to the length of *voir dire* and of the trial court's ruling on his motion for a mistrial. Specifically, he claims that defense counsel argued with the judge long after it was necessary. In order for this court to find that the conduct in question constituted plain error, defendant must overcome the strong presumption that defense counsel's effort to make a record regarding the above issues was sound trial strategy. Defendant has failed to overcome this presumption.

We find that defense counsel was acting as a competent, zealous advocate by making a record on his client's behalf. Furthermore, the instances that defendant complains of occurred outside of the presence of the venire. Accordingly, defendant could not have been prejudiced by defense counsel's actions. We therefore cannot say that defense counsel's actions constituted plain error, as there is no evidence that defendant's substantial rights were abridged by defense counsel's action and the action in question is not an affront to the integrity and reputation of judicial proceedings.

The next issue before this court is whether the trial court erred in permitting the State to exercise a peremptory challenge to excuse venireperson Johnson. The State maintains that defendant was not denied a fair trial when the assistant State's Attorney exercised a peremptory challenge to strike Johnson from the venire. We agree.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the United States Supreme Court outlined a three-step process for evaluating allegations that a prosecutor exercised peremptory challenges to strike a venireperson on the basis of race. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. After the requisite showing has been made, the burden shifts to the State to articulate a race-neutral explanation for the exercise of its relevant peremptory challenge. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 93-97, 90 L. Ed. 2d at 84-88, 106 S. Ct. at 1721-23.

In the present case, the State defended its use of the disputed peremptory challenge before the trial court ruled upon the question of whether Johnson's dismissal from the venire constituted a *prima facie* case of racial discrimination. Regarding Johnson's dismissal

from the venire, the prosecutor explained to the trial court that the State exercised a peremptory challenge to excuse Johnson because it believed that Johnson, due to her experience as a social worker in the mental health profession, would look to her own training and beliefs rather than consider any expert testimony offered at trial. The trial court found that in light of the composition of the jury and the assistant State's Attorney's explanation, no case had been made for Johnson's dismissal on the basis of race. The trial judge then stated that he believed that the State had given a satisfactory race-neutral explanation for exercising a peremptory challenge against venireperson Johnson.

After the State accepted Miller as a juror, defense counsel renewed his *Batson* motion on the basis that Johnson and Miller had similar backgrounds and that the only difference between them was race. The State responded that the two women had different professions: Miller was a reading teacher in a public school, while Johnson worked with mentally retarded children. The State characterized Johnson and Miller as "apples and oranges." The trial court found that the State had given a racially neutral explanation for striking Johnson from the venire based upon the fact that she and Miller had different occupations.

Defense counsel responded by arguing that the State's characterization of Miller and Johnson's employment was "absolutely false." Again, the State explained that Johnson and Miller had different professions: Johnson had a master's degree in both social work and inner city studies, she had worked at the office of special schools and as a part-time teacher at the Mentally Retarded Children's Institute for 10 years, Schools, a private school for mentally retarded children. On the other hand, Miller had a master's degree in special education with a bachelor's degree in education. Miller taught in a public school and her job consisted of teaching children who had difficulty reading.

Defendant contends on appeal that the reasons given for striking Johnson from the venire are not race-neutral. A trial court's decision on the ultimate question of discriminatory intent represents a finding of fact accorded great deference on appeal. (*People v. Hernandez* (1991), 500 U.S. 352, 364, 114 L. Ed. 2d 395, 408-09, 111 S. Ct. 1859, 1868.) The Supreme Court has mandated that such a factual finding would only be set aside if "clearly erroneous." (*Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869.) The trial judge in the present case chose to believe the State's race-neutral explanation for striking Johnson before defense counsel attempted to prove a *prima facie* case of racial discrimination. For this reason, the trial court's finding was not "clearly erroneous" and the trial court properly denied defendant's *Batson* motion.

Defendant also contends that he received ineffective assistance of counsel when defense counsel antagonized the venire by asking it hypothetical questions involving facts which were similar to the facts in the present case. In order for this court to find that the defense attorney's questions constituted plain error, defendant must overcome the presumption that the conduct in question was an integral part of the defense attorney's trial strategy. Again, defendant has failed to overcome this presumption. An attorney's use of hypothetical questions during his examination of a venire is proper. We cannot say that defense counsel's use of hypothetical questions while examining the venire in the present case constituted plain error, as there is no evidence that defendant's substantial rights were adversely affected and defense counsel's actions are not an affront to the integrity and reputation of judicial proceedings.

Defendant next complains that he received ineffective assistance of counsel because defense counsel did not make a record of the race of each venireperson. In order for this court to find that the omission in question constituted plain error, defendant must demonstrate that he was prejudiced by defense counsel's conduct. Defendant has failed to make such a showing. Here, every objection made by defense counsel regarding stricken black venirepersons is clearly stated in the record. Thus, defendant was not prejudiced by the lack of a complete record of the race of each member of the venire. Defense counsel's actions, therefore, did not constitute plain error.

Next, defendant alleges that he received ineffective assistance of counsel when his attorney failed to raise the defense of voluntary intoxication. We cannot review the merits of this allegation because the issue was not preserved for appellate review and the alleged error does not constitute plain error. In order for this court to find that the defense attorney's failure to invoke the defense of voluntary intoxication constituted plain error, defendant must overcome the strong presumption that his attorney's failure to invoke the defense constituted sound trial strategy. Defendant has failed to overcome this presumption.

Trial strategy includes an attorney's choice of one theory of defense over another. (See *People v. Stewart* (1984), 101 Ill. 2d 470, 492-93, 463 N.E.2d 677, 688.) Voluntary intoxication is not a defense to a criminal act unless the defendant is so inebriated that he is incapable of forming the requisite mental state which is an element of the crime for which he is charged. (Ill. Rev. Stat. 1987, ch. 38, par. 6—3(a).) In the present case, the only evidence of defendant's intoxication on the night of June 13, 1986, was his own testimony. There was no corroboration of his claim that he consumed alcohol

and drugs. Detective Robertson and Moses Jones both testified that they observed defendant walk in a normal fashion shortly after the stabbing. Detective Robertson testified that defendant did not appear to be under the influence of alcohol or drugs after his arrest. Dr. Markos testified that in his professional opinion, defendant was not under the influence of PCP at the time of the alleged stabbing. On the basis of the evidence, a jury could have concluded that defendant's actions before and after the stabbings belie the defense of voluntary intoxication. Defendant, therefore, has failed to successfully rebut the presumption that his attorney declined to raise the defense of voluntary intoxication because he believed that it would not have been sound trial strategy in light of the evidence. We therefore cannot say that defense counsel's failure to invoke the defense of voluntary intoxication constituted plain error, as there is no evidence that defendant's substantial rights were affected by defense counsel's failure to invoke the defense and defense counsel's failure to raise the defense is not an affront to the integrity and reputation of judicial proceedings.

Defendant further alleges that he received ineffective assistance of counsel because defense counsel had difficulty articulating questions during his direct examination of Dr. Gaspero. Defendant has failed to preserve this issue for review. In order for this court to find that the defense attorney's questioning of Dr. Gaspero amounted to plain error, defendant must show that defense counsel's method of questioning the witnesses was not trial strategy and that he was prejudiced by defense counsel's actions.

We find that defense counsel did an adequate job in his direct examination of Dr. Gaspero. Defense counsel specifically asked Dr. Gaspero if he could make a diagnosis regarding defendant's mental health on the date of the murder. After the doctor articulated his diagnosis, defense counsel asked him if he had an opinion based on a reasonable degree of professional certainty as to whether or not defendant was suffering from a disease or defect of the mind on the date of the stabbing. He then asked Dr. Gaspero what defendant "lacked," and Dr. Gaspero replied, "an understanding of what was going on specifically and also in terms of his ongoing behavior he could not stop what he was doing." Defense counsel also asked Dr. Gaspero what his opinion was regarding defendant's ability or capacity to appreciate the criminality of his actions or to conform his conduct to the requirements of the law. Defendant has failed to show that defense counsel's manner of questioning Dr. Gaspero was not trial strategy or that he was prejudiced by his attorney's method of questioning Dr. Gaspero. There is no evidence that defendant's

substantial rights were adversely affected, and defense counsel's actions are not an affront to the integrity and reputation of judicial proceedings. We therefore cannot say that defense counsel's method of questioning of Dr. Gaspero constituted plain error.

Next, defendant contends that the trial court erred in refusing to admonish Dr. Markos during his cross-examination by the defense. The State maintains that the trial court acted within its discretion by declining to instruct Dr. Markos to refrain from making unsolicited comments during his testimony. During defense counsel's cross-examination of Dr. Markos, he asked Dr. Markos if certain cultural differences between him and defendant are significant. Dr. Markos responded in the negative. Defense counsel again posed the question to Dr. Markos but objected to his answer. The trial judge overruled the objection, stating that defense counsel's question left him with no choice but to answer as he did. Defense counsel, however, continued to belabor the point over numerous objections and denials of prejudice by Dr. Markos.

After several such insinuations of racial prejudice on the part of Dr. Markos, defense counsel said: "Doctor, do you have a general idea of what I'm talking about when I talk about differences[?]" Dr. Markos replied: "I have an idea, but I think you are perhaps a bit unprofessional if I may say so." Defense counsel replied "[Y]ou may not" and he then asked the trial judge to instruct Dr. Markos not to make such comments. The State objected to defense counsel's arguing with the doctor.

Following this incident, defense counsel continued to ask Dr. Markos about the cultural differences between him and defendant, and his possible cultural and racial biases. The trial court told defense counsel that the questions regarding "cultural differences" were too broad.

Later on during cross-examination, defense counsel asked Dr. Markos a series of technical questions that could not be adequately or sufficiently answered with a "yes" or "no" answer. When Dr. Markos attempted to explain his answers, defense counsel said: "I have no further questions and I object to him making a statement trying to explain himself." To this, Dr. Markos again replied that defense counsel was acting in an "unprofessional" manner. Defense counsel did not object.

In the present case, the trial court properly exercised its discretion when it told defense counsel to pose another question instead of admonishing Dr. Markos. It is noteworthy that the trial judge also refrained from ruling on the State's objection made on the basis that defense counsel was arguing with the witness. By

refraining from admonishing Dr. Markos as well as defense counsel, the trial court diverted the jury's attention from the animosity between defense counsel and Dr. Markos. The trial judge did not demonstrate signs of partiality in acting as he did.

Defendant cites *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41, *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011, and *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118, in support of his contention that it is improper for a witness to disparage defense counsel in the presence of a jury. All of these cases are distinguishable from the present case because they concern the subject of the prejudicial effect of prosecutorial misconduct in the presence of a jury and not the prejudicial effect of a witness' remarks. As such, defendant's reliance upon these cases is misplaced.

Defendant next contends that he received ineffective assistance of counsel when defense counsel called Dr. Markos a "fuckin' asshole." The trial judge was apprised of this allegation and said, "whether this occurred or not I don't know." The trial judge then instructed the State to investigate the matter; however, no formal allegations against the defense are included in the record on appeal. We therefore cannot review the merits of this question.

In addition, defendant alleges that he received ineffective assistance of counsel when defense counsel antagonized the court by objecting to the judge's publishing procedure as being a "cover" and a "rouse [*sic*] to fill time" while the trial judge was informing defense counsel and the State of the procedure that he would employ for publishing items to the jury. The trial judge wanted each juror to examine each item in evidence and then pass it on to the next juror. Defense counsel then objected to that process on the basis that such a lengthy procedure was unnecessary. The trial court overruled defense counsel's objection. Defendant has failed to properly preserve this issue for review. In order for this court to find that defense counsel's objection was plain error, he must demonstrate that his attorney's objection was not trial strategy. Defendant has failed to make this showing. It is clear from the record that defense counsel was making a good-faith effort to zealously represent his client. Trial strategy is not a proper area of review for purposes of defendant's claim of ineffective assistance of counsel. We therefore cannot review the merits of this allegation.

Next, defendant contends that he was denied a fair trial because he was prejudiced by prosecutorial misconduct during the State's closing argument. Specifically, defendant claims that the prosecution mischaracterized the defense by making inflammatory racial remarks. In addition, defendant contends that the prosecutor misled

the jury in its summary of Dr. Gaspero's testimony during closing arguments when he incorrectly stated that Dr. Gaspero did not render an opinion regarding defendant's sanity at the time of the offense.

The State initially maintains that defendant has waived his right to allege error on appeal since he failed to object to the first alleged error at trial, and because defendant only made a general allegation that there was misconduct on the part of the prosecutor during closing arguments in his post-trial motion. In the alternative, the State maintains that it was rebutting defense counsel's statements during closing argument in which he urged the jury to treat defendant's race as a mitigating factor when reaching its verdict. The State also maintains that the prosecutor did not make the statement in question regarding Dr. Gaspero's testimony and that the prosecutor correctly used closing argument to summarize Dr. Gaspero's testimony on direct examination.

We find that defendant has waived his right to appellate review of the merits of the above issues because he failed to preserve the issues for appellate review and there is no evidence of plain error. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 322-23, 568 N.E.2d 1234, 1265; *People v. Doe* (1988), 175 Ill. App. 3d 371, 377, 529 N.E.2d 980, 984-85; *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 876, 463 N.E.2d 864, 871.) First, the prosecutor's remarks concerning defendant's race do not amount to plain error as defendant failed to object to the error at trial. Where there are allegations of prosecutorial misconduct, arguments of both the prosecutor and defense counsel must be examined in their entirety and the complained-of comments must be placed in their proper context. (*People v. McBounds* (1988), 182 Ill. App. 3d 1002, 1015, 536 N.E.2d 1225, 1234.) While defendant alleges that the prosecutor's characterization of him was improper, he fails to accurately portray the comments in question within the context of closing arguments. Defendant failed to acknowledge his own closing remarks, which were as follows:

> "[DEFENSE COUNSEL]: [Defendant] is as much a victim in this case as anybody because he was victimized at that point. And again, you have to consider during his developmental period, that had an effect on him, ladies and gentlemen. It must have had an effect on him. I can't imagine that not having an effect on him as he came of age, as he was introduced to the world through Walter Mae Jones. I think that caused some problems, some severe problems that were exacerbated by the obvious drinking. But [defendant], from an incredibly early age, it was encouraged by his father and proved by the environment he grew up in. I in no way

mean to talk about a situation that involves some type of bias[;] however, there are facts. *The fact is that he grew up in the black— that he is black. That it had an effect.* It doesn't mean anything one way or another. It is a fact you heard and have an understanding of what type of dysfunctional family he grew up in, the problems that occurred when he was a young man." (Emphasis added.)

The above argument shows that defense counsel attempted to win the jury's sympathies by introducing race as an issue in the trial. In the present case, defendant has removed the complained-of comment from its proper context and thus distorted its significance. (See *People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612, 625.) The State merely responded that race did not justify defendant's alleged criminal actions. Accordingly we find that defendant is not entitled to review of his complaint that he was denied a fair trial on the basis that the prosecutor made racially inflammatory remarks because the prosecution did not commit plain error.

Next, we will address defendant's allegation that the State misled the jury in its summary of Dr. Gaspero's testimony during closing arguments when the prosecutor incorrectly stated that Dr. Gaspero did not render an opinion regarding defendant's sanity at the time of the offense. Again, we find defendant has waived his right to appellate review of the merits of the above issue as he did not properly preserve the issue for review because he failed to mention it in his post-trial motion and because there is no evidence of plain error.

It is well established that a prosecutor has wide latitude during closing argument and the trial court's determination regarding the propriety of remarks made during closing argument will not be disturbed by a court of review absent an abuse of discretion. (*People v. Stuckey* (1992), 231 Ill. App. 3d 550, 563, 596 N.E.2d 646, 655.) A prosecutor's comment may not be labeled improper if the comments in question were based upon the facts in the record or reasonable inferences drawn therefrom. *Stuckey*, 231 Ill. App. 3d at 563, 596 N.E.2d at 655; *People v. Moya* (1988), 175 Ill. App. 3d 22, 24, 529 N.E.2d 657, 659.

In the present case, the prosecutor properly commented upon the evidence. The prosecutor merely stated that Dr. Gaspero never testified that defendant was suffering from a "substantial" mental disorder at the time he allegedly committed the offense. A review of the record demonstrates that Dr. Gaspero testified that defendant suffered a borderline personality disorder and that he could not appreciate the criminality of his conduct. Accordingly, the prosecutor correctly stated that Dr. Gaspero did not testify that defendant

suffered a "substantial" mental disorder. The trial court's ruling on defendant's objection was a proper use of judicial discretion. There is no evidence of plain error and defendant is not entitled to review.

The next issue before this court is whether defendant received ineffective assistance of counsel when defense counsel stated during closing arguments that defendant intended to "hurt" the decedent. We cannot review the merits of defendant's claim since defendant did not object to defense counsel's statement, he failed to mention the objection in his post-trial motion and because defense counsel's statement did not constitute plain error. In order for this court to find that the defense attorney's statement constituted plain error, defendant must overcome the presumption that the statement in question was an integral part of the defense attorney's trial strategy. Defendant has failed to overcome this presumption.

In order to render a guilty verdict on the murder charge, the jury had to find that defendant intended to kill or render great bodily harm to Jones, or that defendant knew that his acts would cause her death or inflict great bodily harm upon her. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2).) A successful insanity defense to defendant's murder charge would necessitate a finding that he could not form the requisite intent to kill or render great bodily harm to the decedent. The record indicates that defense counsel merely stated that defendant intended to "*hurt*" Jones; however, *he did not say that defendant intended to kill her or inflict great bodily harm upon her*. A close reading of the record shows that defense counsel did not concede his client's guilt as to the charge for murdering Jones, for to do so, he would have had to explicitly state that defendant intended to kill Jones or inflict great bodily harm upon her. During closing arguments, defense counsel made the statement in question in the context of his argument that defendant was insane at the time of the decedent's death. Defendant, therefore, has failed to overcome the presumption that his attorney's argument was anything other than sound trial strategy. Accordingly, we find that defense counsel's statement did not constitute plain error because his substantial rights were not affected by defense counsel's statement and because the alleged error was not an affront to the integrity and reputation of the judicial proceedings.

With respect to the above allegations of defense counsel's ineffectiveness, defendant has failed to overcome the presumption that his attorney was anything other than a competent, zealous advocate (see *People v. Caballero* (1989), 126 Ill. 2d 248, 261-62, 533 N.E.2d 1089, 1092), or that the action in question prejudiced him and constituted plain error. We therefore cannot review the merits of

defendant's allegation that he received ineffective assistance of counsel during defense counsel's closing argument.

Finally, defendant alleges that the cumulative effect of the alleged errors at trial deprived him of his constitutional right to a fair trial and due process of law. The State maintains that the cumulative effect of the alleged errors made during trial does not warrant a new trial. We agree.

In cases where individual errors committed during a trial would not merit reversal alone, the cumulative effect of such errors may be sufficient to have deprived the defendant of a fair trial. (*People v. Albanese* (1984), 102 Ill. 2d 54, 82-83, 464 N.E.2d 206, 220; *People v. Stuckey* (1992), 231 Ill. App. 3d 550, 563, 596 N.E.2d 646, 655.) In such cases, due process and fundamental fairness require that the cause be remanded for a new trial. *Stuckey*, 231 Ill. App. 3d at 563, 596 N.E.2d at 655; *People v. Johnson* (1991), 215 Ill. App. 3d 713, 734-35, 575 N.E.2d 1247, 1260-61.

In the present case, defendant has failed to demonstrate that any issue which he brought before this court constitutes reversible error and only two of the alleged errors may have amounted to harmless error. Upon reviewing the record, we find that the cumulative effect of the errors at trial did not deprive defendant of a fair trial. "The whole can be no greater than the sum of its parts." (*Albanese*, 102 Ill. 2d at 82-83, 464 N.E.2d at 220.) Accordingly, defendant has failed to demonstrate that the cumulative effect of the errors at trial warrants reversal and a new trial.

For the aforementioned reasons, we affirm defendant's convictions and sentences for first degree murder and aggravated battery.

Affirmed.

TULLY and CERDA, JJ., concur.